
RECEIVED
ASHEVILLE, N.C.
OCT 1 3 2000
U. S. Dist. Court
Dist. of N. C.

# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

VOLVO TRADEMARK HOLDING
AKTIEBOLAGET,
    a Swedish corporation,

VOLVO CONSTRUCTION EQUIPMENT
NORTH AMERICA, INC.,
    a Delaware corporation, and

CHAMPION ROAD MACHINERY LIMITED,
    a Canadian corporation,

        Plaintiffs,

v.

AIS CONSTRUCTION EQUIPMENT
CORPORATION,
    a Michigan corporation,

CLM EQUIPMENT COMPANY, INC.,
    a Texas corporation,

FUTURE EQUIPMENT COMPANY,
INC.,
    a Texas corporation, and

NUECES FARM CENTER, INC.,
d/b/a NUECES POWER EQUIPMENT,
    a Delaware corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.: *1:00CV238 T*

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Volvo Trademark Holding Aktiebolaget ("Volvo Trademark") and Volvo Construction Equipment North America, Inc. ("Volvo Construction") (collectively, the "Volvo Plaintiffs"), together with Plaintiff Champion Road Machinery Limited ("Champion Road"), for their Complaint for Declaratory Judgment against AIS Construction Equipment Corporation ("AIS"), CLM Equipment Company, Inc. a/k/a CLM Equipment Rentals, Inc. ("CLM"), Future Equipment Company, Inc. ("FEC"), and Nueces Farm Center, Inc., d/b/a Nueces Power Equipment ("NPE") (collectively, the "CHAMPION Trademark Licensees"), respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Complaint is filed by Volvo Trademark, Volvo Construction, and Champion Road pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure.

2.      The declaratory judgment sought by Volvo Trademark, Volvo Construction, and Champion Road would clarify their rights and obligations under the Trademark Act of 1946, as amended, 15 U.S.C. § 1101 *et seq.* (the "Lanham Act"), with respect to the VOLVO Marks, as that term is defined herein. Specifically, Volvo Trademark, Volvo Construction, and Champion Road seek a declaratory judgment that:

a.      The Lanham Act does not require the licensing of the VOLVO Marks to *any* third parties, including but not limited to the CHAMPION Trademark Licensees named as Defendants and the Other Potential Defendants identified herein.

b.      Volvo Trademark — as the owner of the VOLVO Marks — and Volvo Construction — as a "related company" within the meaning of Section 45 of the Lanham

- 2 -

Act, 15 U.S.C. § 1127, and as a licensee with rights to sublicense the VOLVO Marks only in accordance with a license from Volvo Trademark — have the absolute right and indeed the affirmative duty, pursuant to Section 45 of the Lanham Act, to control the quality and uniformity of the goods and services associated with the VOLVO Marks and the identity of independent dealers licensed to use the VOLVO Marks.

c.    The fact that other goods and services *not* identified with the VOLVO Marks may be similar or even identical to goods and services that *are* identified with the VOLVO Marks does not mean that the VOLVO Marks can be used in connection with the sale and service of construction equipment that Volvo Trademark and Volvo Construction have *not* authorized to be identified with the VOLVO Marks. Under the Lanham Act, it is irrelevant whether the motor graders sold under the Champion Trademark may be — except for the identifying trademark — virtually indistinguishable from the motor graders that Volvo Construction intends to market under the VOLVO Marks beginning in January 2001. The CHAMPION Trademark Licensees are *not* entitled to a license to use the VOLVO Marks or to distribution rights to motor graders identified with the VOLVO Marks.

d.    Any use by the CHAMPION Trademark Licensees of the VOLVO Marks without a license to do so would represent (i) trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), (ii) unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), and (iii) trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)(1).

e.    With respect to the VOLVO Marks, Champion Road is not a "related company" to Volvo Trademark within the meaning of Section 45 of the Lanham Act, 15

U.S.C. § 1127, and Champion Road is not a licensee of the VOLVO Marks. Once Champion Road starts manufacturing motor graders under the VOLVO Marks, its license will allow use of the VOLVO Marks only for purposes of supplying motor graders to Volvo Construction and certain of its affiliates engaged in the manufacture and sale of construction equipment (collectively, the "Volvo Construction Equipment Group"). Champion Road's manufacturing license will contain a prohibition against transfer of the license and a prohibition against sublicensing the VOLVO Marks. Champion Road therefore has no right or obligation to license or sublicense the VOLVO Marks to the CHAMPION Trademark Licensees and the Other Potential Defendants. Nor does Champion Road have any right or obligation to supply motor graders under the VOLVO Marks to anyone outside the Volvo Construction Equipment Group, including but not limited to the CHAMPION Trademark Licensees and the Other Potential Defendants.

3. In addition to the declaratory judgment sought by Volvo Trademark, Volvo Construction, and Champion Road with respect to their rights and obligations under the Lanham Act, Volvo Construction and Champion Road also seek a declaratory judgment with respect to their rights and obligations under certain contracts (hereinafter referred to as the "Champion Dealer Agreements") with the CHAMPION Trademark Licensees. Pursuant to the Champion Dealer Agreements, Champion Road licensed each of the CHAMPION Trademark Licensees to use the CHAMPION Trademark, as that term is defined herein, and to distribute motor graders under the CHAMPION Trademark within a designated territory. In 1997, the stock of Champion Road was acquired by an affiliate of Volvo Construction, Volvo Construction Equipment N.V. In 1998, Champion Road appointed Volvo Construction as its agent for purposes of managing Champion Road's distribution relationships in North America. At the same time, Champion

Road granted Volvo Construction the right to make certain decisions on behalf of Champion Road with respect to the Champion Dealer Agreements, including but not limited to termination. To avoid a multiplicity of actions regarding their rights and obligations under the Champion Dealer Agreements, Volvo Construction and Champion Road seek a declaratory judgment that:

a. The Champion Dealer Agreements impose obligations only upon Champion Road as principal and impose no obligations upon Volvo Construction as agent for Champion Road, so that Volvo Construction has no contractual obligations whatsoever to the CHAMPION Trademark Licensees under the Champion Dealer Agreements.

b. Neither Volvo Construction nor Champion Road has any contractual obligation to continue selling motor graders under the CHAMPION Trademark or to continue the Champion Dealer Agreements in effect.

c. Neither Volvo Construction nor Champion Road has any contractual obligation to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

d. The CHAMPION Trademark Licensees cannot maintain actions in tort against either Volvo Construction or Champion Road for discontinuing the manufacture and sale of motor graders under the CHAMPION Trademark, terminating the Champion Dealer Agreements, or failing to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

4. To the extent that the CHAMPION Trademark Licensees claim that any state construction equipment dealership statute, franchise and dealership relationship law, or common law doctrine obligates Volvo Construction and/or Champion Road to supply them with motor

graders under the VOLVO Marks, Plaintiffs Volvo Trademark, Volvo Construction, and Champion Road seek a declaratory judgment that any such state law would be preempted by the Supremacy Clause, Article VI of the United States Constitution, and by the Lanham Act, 15 U.S.C. §§ 1121(a) and 1127.

5. This Court has jurisdiction to hear the request for declaratory relief of Volvo Trademark, Volvo Construction, and Champion Road as follows:

a. Pursuant to 15 U.S.C. §§ 1114(1), 1125(a)(1), and 1125(c)(1), and 28 U.S.C. §§ 1338(a) and 1338(b), this Court has jurisdiction over the claims of Volvo Trademark, Volvo Construction, and Champion Road that the Lanham Act (i) does not require the licensing of the VOLVO Marks to the CHAMPION Trademark Licensees, (ii) grants to Volvo Trademark and its affiliates the absolute right and indeed the affirmative duty to control the quality and uniformity of the goods and services associated with the VOLVO Marks, (iii) does not allow the CHAMPION Trademark Licensees to use the VOLVO Marks in connection with construction equipment that Volvo Trademark and/or Volvo Construction have *not* authorized to be identified with the VOLVO Marks, and (iv) does not permit the CHAMPION Trademark Licensees to use the VOLVO Marks without a license to do so.

b. Pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction, this Court has jurisdiction over the following claims of Volvo Construction and Champion Road, each of which is sufficiently related to the claims on which its original jurisdiction is based so that it is part of the same case or controversy as their Lanham Act claims, that (i) Volvo Construction has no contractual obligations whatsoever to the CHAMPION Trademark Licensees, (ii) neither Volvo Construction nor Champion Road has any

contractual obligation to continue selling motor graders under the CHAMPION Trademark, (iii) neither Volvo Construction nor Champion Road has any contractual obligation to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks, and (iv) by failing to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks, neither Volvo Construction nor Champion Road would be committing any actionable torts against the CHAMPION Trademark Licensees.

     c.     Pursuant to the Supremacy Clause, 28 U.S.C. §§ 1131 and 1338, and Section 39(a) of the Lanham Act, 15 U.S.C. § 1121(a), this Court has jurisdiction over the claims of Volvo Trademark, Volvo Construction, and Champion Road that federal law would preempt any state law requirement that Volvo Construction and/or Champion Road supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

     6.     This Court also has jurisdiction over the request for a declaratory judgment of Volvo Trademark, Volvo Construction, and Champion Road pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201. Both Volvo Construction and Champion Road have a reasonable apprehension of being sued by the CHAMPION Trademark Licensees and the Other Potential Defendants named herein. A multiplicity of actions is likely once the CHAMPION Trademark Licensees and Other Potential Defendants receive formal notice that motor graders will no longer be manufactured and sold under the CHAMPION Trademark and that neither Volvo Construction nor Champion Road will supply the CHAMPION Trademark Licensees and the Other Potential Defendants with motor graders under the VOLVO Marks. By virtue of its ownership of the VOLVO Marks, Volvo Trademark would be a necessary party to such litigation.

7.    Without the declaratory judgment that they seek, Volvo Construction and Champion Road face a multiplicity of actions in which joinder of Volvo Trademark would be necessary.  Without a declaratory judgment, these actions are likely to proceed in multiple forums for at least two reasons:

a.    First, the Champion Dealer Agreements are not uniform with respect to the governing law and forum in which disputes are to be resolved.  Some of the Champion Dealer Agreements contain the Canadian Forum Selection Provision, as that term is defined herein.  The Canadian Forum Selection Provision mandates dispute resolution in Ontario, Canada.  Some of the Champion Dealer Agreements contain the South Carolina Choice of Law Provision, as that term is defined herein.  The South Carolina Choice of Law Provision states that the Champion Dealer Agreement is governed by South Carolina law but does not mandate dispute resolution in any particular forum.

b.    Second, it is likely that the CHAMPION Trademark Licensees and the Other Potential Defendants whose Champion Dealer Agreements *do* contain the Canadian Forum Selection Provision will not comply with the contractual forum selection clause.  Moreover, there is no guarantee that all of the Champion Dealer Agreements will be enforced in every jurisdiction in which the CHAMPION Trademark Licensees and the Other Potential Defendants might otherwise bring suit.  Even if the Canadian Forum Selection Provision is enforced, no Canadian court could decide the Lanham Act claims of Volvo Trademark (which is *not* a party to *any* of the Champion Dealer Agreements), Volvo Construction, and Champion Road.

8.     For the foregoing reasons, the forums in which some of the CHAMPION Trademark Licensees and Other Potential Defendants may bring suit against Volvo Construction and/or Champion Road include the following:

a.     North Carolina, where Volvo Construction has its principal place of business;

b.     South Carolina, whose law governs those Champion Dealer Agreements that contain the South Carolina Choice of Law Provision and where Champion Road formerly had its principal place of business;

c.     Delaware, where Volvo Construction is incorporated;

d.     Ontario, Canada, where Champion Road is now incorporated and has its principal place of business; and

e.     the U.S. states and Canadian provinces in which the CHAMPION Trademark Licensees and Other Potential Defendants are incorporated or have their principal place of business. These states and provinces include, in addition to Delaware and North Carolina, the following:   Alabama, Arizona, Arkansas, Georgia, Idaho, Louisiana, Maine, Manitoba, Michigan, Mississippi, Montana, New York, Ohio, Oklahoma, Oregon, South Dakota, Texas, Vermont, Washington, West Virginia, and Wisconsin.

9.     The declaratory judgment sought by Volvo Trademark, Volvo Construction, and Champion Road thus serves the purpose of the Declaratory Judgments Act by avoiding a multiplicity of actions. This Complaint provides an adequate, expedient, and inexpensive means for declaring in one action the rights and obligations of the litigants.

## PARTIES

### (The Volvo Plaintiffs)

10.     Plaintiff Volvo Trademark is a Swedish corporation with its principal place of business at Goteborg, Sweden.  Volvo Trademark owns and manages the portfolio of VOLVO Marks on behalf of Aktiebolaget Volvo ("AB Volvo"), the ultimate parent of Volvo Construction, and Volvo Car Corporation, a wholly-owned subsidiary of Ford Motor Company ("Ford").  Volvo Trademark was formed following Ford's purchase of AB Volvo's worldwide passenger car business in 1999.  As part of the purchase agreement, Ford obtained the right to use the VOLVO Marks for passenger vehicles — including cars, minivans, sport utility vehicles, and light trucks — on a perpetual basis.  AB Volvo retained the right to use the VOLVO Marks for commercial vehicles and other non-automotive-related products.  Volvo Trademark ensures that the respective rights of Ford and AB Volvo to the VOLVO Marks are adequately protected and that both Ford and AB Volvo are afforded the opportunity to participate in decisions that might affect their respective interests in the VOLVO Marks.

11.     Plaintiff Volvo Construction is a Delaware corporation with its principal place of business at One Volvo Drive, Asheville, North Carolina 28803.  Volvo Construction is a wholly-owned subsidiary of VNA Holding, Inc.  VNA Holding, Inc. is a Delaware corporation with its principal place of business at 7825 National Service Road, Greensboro, North Carolina 27409. VNA Holding, Inc. is a wholly-owned subsidiary of AB Volvo.

### (Plaintiff Champion Road and Its Relationship to the Volvo Plaintiffs)

12.     Plaintiff Champion Road is a Canadian corporation with its principal place of business in Goderich, Ontario.  Champion Road manufactures and sells motor graders under the CHAMPION Trademark.

13.     On or about March 22, 1997, the stock of Champion Road was acquired by VCE

Acquisition, Inc., a wholly-owned subsidiary of Volvo Construction Equipment N.V. Volvo

Construction Equipment N.V. is a Netherlands corporation with its principal place of business in

Brussels, Belgium. Since 1995, Volvo Construction Equipment N.V. has been a wholly-owned

subsidiary of AB Volvo. Effective January 19, 1998, VCE Acquisition, Inc., Champion Road

Machinery Limited, and Champion Road Machinery Sales Ltd. merged to form a new

corporation, also named Champion Road Machinery Limited. This new corporation, Plaintiff

Champion Road in this case, is a wholly-owned subsidiary of Volvo Construction Equipment

N.V. Volvo Construction Equipment N.V. directs the manufacturing and sales activities of the

various affiliates (including Volvo Construction and Champion Road) that comprise the Volvo

Construction Equipment Group.

14.     The Volvo Construction Equipment Group manufactures and sells construction

equipment, including wheel loaders, excavators, articulated haulers, and motor graders. Some of

the construction equipment sold by the Volvo Construction Equipment Group is manufactured

and/or assembled in Asheville, North Carolina at a facility owned and operated by Plaintiff

Volvo Construction. Volvo Construction has exclusive distribution rights within the "NAFTA

Region" (the United States, Canada, and Mexico) for all construction equipment manufactured

by the Volvo Construction Equipment Group. This equipment includes the motor graders that

are currently manufactured in Goderich, Ontario by Champion Road under the CHAMPION

Trademark and are (or until recently, were) sold to the CHAMPION Trademark Licensees and

the Other Potential Defendants pursuant to the Champion Dealer Agreements.

15.     The Champion Dealer Agreements were the subject of a September 11, 1998

Agreement between Champion Road and Volvo Construction (the "Agency Agreement"), a copy

of which is attached as Exhibit A. The Agency Agreement contemplated that the Volvo Construction Equipment Group would benefit from a consolidation of the North American distribution networks of Volvo Construction and Champion Road:

> Volvo and Champion sell different types of products that complement each other. Many construction and road building companies use the types of construction equipment products that are manufactured by Champion and also use the types of construction equipment products that are manufactured by Volvo. Many competitive products manufactured by other companies are also sold in this market. In this market, Volvo and Champion each sell their products primarily through distributors located throughout North America. Volvo and Champion typically have different distributors in the same geographic area. Volvo and Champion each believe that they could increase the sale of products manufactured by each of them if they could have their products sold by the same distributors. Strengthening the product lines of their dealers and thereby increasing the sales efforts each distributor will devote to the sale of their products should increase the market share of these products. This should in turn increase interbrand competition in the market place.

Agency Agreement ¶ 1. The Agency Agreement also recognized that "some of the Volvo and Champion distributors are not performing in an acceptable manner and there is a good cause to terminate them." *Id.* ¶ 2. Pursuant to the Agency Agreement, Volvo Construction was appointed as Champion Road's ***agent*** and given the authority to terminate the Champion Dealer Agreements:

> 3. To accomplish this goal and to remove non-performing distributors, Volvo and Champion will need to renegotiate, amend, or terminate their relationship with many of their existing distributors. To facilitate achieving these goals, one entity needs to have full authority to manage, negotiate, amend, terminate, and establish distributor relationships.

> 4. Therefore, Champion hereby appoints Volvo as its sole and exclusive agent to manage, negotiate, amend, terminate, and establish distributor relationships for Champion products. This work is to be done in Volvo's sole and exclusive discretion. Volvo may take all of these actions (including binding legal action of any type) in its own name or in the name of Champion as Volvo deems best.

*Id.* ¶¶ 3-4. Because the Agency Agreement did not assign the Champion Dealer Agreements to Volvo Construction, Champion Road remains contractually liable to the CHAMPION Trademark Licensees.

### (The CHAMPION Trademark Licensees)

16.     Defendant AIS is a Michigan corporation with its principal place of business at 600 44th Street, S.W., Grand Rapids, Michigan. AIS was a party to a Champion Dealer Agreement with an effective date of August 17, 1984. A copy of the AIS Champion Dealer Agreement is attached hereto as Exhibit B.

17.     Defendant CLM is a Texas corporation with its principal place at Hwy 90 E., Bernard Road, Broussard, Louisiana. CLM was a party to a Champion Dealer Agreement with an effective date of June 6, 1984. A copy of the CLM Champion Dealer Agreement is attached hereto as Exhibit C.

18.     Defendant FEC is a Texas corporation with its principal place of business at 2019 Airport Freeway, Euless, Texas. FEC was a party to a Champion Dealer Agreement with an effective date of July 15, 1996. A copy of the FEC Champion Dealer Agreement is attached hereto as Exhibit D.

19.     Defendant NPE is a Delaware corporation with its principal place of business located at 7510 IH 37, Corpus Christi, Texas 78409. NPE was a party to a Champion Dealer Agreement with an effective date of December 20, 1995. A copy of the NPE Champion Dealer Agreement is attached hereto as Exhibit E.

### (The Other Potential Defendants)

20.     The CHAMPION Trademark Licensees named as Defendants are not the only construction equipment dealers with which Champion Road contracted for the distribution of

motor graders. Rather, Champion Road entered into similar agreements with various other dealers located throughout the United States and Canada. These dealers include the following who, by virtue of the termination of their respective Champion Dealer Agreements and/or the impending discontinuation of the manufacture of motor graders under the CHAMPION Trademark, are hereinafter referred to as the "Other Potential Defendants":

| Dealer Name | Location | State of Incorporation |
|---|---|---|
| Abele Tractor & Equipment Company, Inc. | New York | New York |
| Beauregard Equipment Inc. | Vermont | Maine |
| Burch-Lowe, Inc. | Georgia | Georgia |
| N.A. Burkitt, Inc. | Maine | Maine |
| United Rentals, Inc. f/k/a Century Equipment Company | Connecticut | Connecticut |
| Clark Machinery Company | Arkansas | Arkansas |
| Cooper Equipment Company | Texas | Texas |
| Crawler Supply Co. Inc. | Louisiana | Louisiana |
| J.D. Evans, Inc. | South Dakota | South Dakota |
| The McLean Company | Ohio | Ohio |
| Mid South Machinery, Inc. | Mississippi | Mississippi |
| Miller-Bradford & Risberg, Inc. | Michigan | Wisconsin |
| Mitchell Distributing Company | North Carolina | North Carolina |
| Monroe Tractor and Implement Co. Inc. | New York | New York |
| Joe Money Machinery Company, Inc. | Alabama | Alabama |

| | | |
|---|---|---|
| O.C.T. Equipment Inc. | Oklahoma | Oklahoma |
| Querel Equipment Sales and Supply Ltd. | Manitoba | N/A |
| Ralph C. Herman Co. Inc. | New York | New York |
| RB Everett & Company | Texas | Texas |
| St. Joseph Equipment, Inc.-Industrial Division | Wisconsin | Wisconsin |
| Tracey Road Equipment Inc. | New York | New York |
| Trius, Inc. | New York | New York |
| Tucson Tractor Company | Arizona | Arizona |
| Western Power and Equipment Co. | Washington | Oregon |
| West Virginia Tractor Company | West Virginia | West Virginia |
| Western Plains Machinery Co. | Montana | Montana |

21.     To the extent that Volvo Construction and/or Champion Road face disputes with the Other Potential Defendants that present a justiciable case or controversy, Volvo Trademark, Volvo Construction, and Champion Road may amend or seek leave to amend this Complaint to join one or more of the Other Potential Defendants as Defendants in this action.  Upon such amendment, all references herein to the CHAMPION Trademark Licensees shall be deemed to include such Other Potential Defendants who have been so joined.

## FACTS COMMON TO ALL COUNTS

### (Use and Federal Registrations of the VOLVO Marks)

22.     The VOLVO Marks are the subject of a number of registrations on the Principal Register of the U.S. Patent & Trademark Office (the "PTO").  These registrations, which were originally registered in the name of AB Volvo, include the following registrations of VOLVO (collectively, the "VOLVO Trademark Registrations"):

| Registration No. | Registration Date | Date of First Use | Goods and Services |
|---|---|---|---|
| 636,129 | 10/23/56 | Unavailable | Automobiles and trucktractors and parts thereof; Int. Class 12 |
| 636,128 | 10/23/56 | Unavailable | Automobiles and trucktractors and parts thereof; Int. Class 12 |
| 1,220,779 | 12/21/82 | 00/00/27 | Cars, buses, trucks, tractor units, agricultural tractors, dumpers, dump trucks, and parts and accessories-namely, vehicle chassis, engines, starter motors, mufflers, spark eliminators, power transmissions, transmissions, axles, shafts and couplings, all for land vehicles; trailer hitches, power take-offs, springs, shock absorbers, fan belts, level regulators, wheels, wheel bearings, hubs, hub caps, tires, anti-slip chains for tires, mud flaps, brakes, brake linings, bumpers, fenders, cabs, doors, seats, safety seats, seat covers, seat belts, steering wheels, anti-theft alarms, steering locks, windshields, windshield and headlight wipers, wiper blades, driving mirrors, tank caps, roof racks and ski racks, all for vehicles: propellers, trimming vanes, steering units, steering wheels, marine hardware, all for boats; Int. Class 12 |
| 1,250,917 | 09/13/83 | 00/00/27 | Non-electrical cables, wires and terminals; locks; tubes, hoses and pipe and clamps, clips and connections therefor; screws; bolts; nuts; rivets; wahers; plugs; split pins; shims; spacer rings; woodruff keys; screw unions; bolts; hinges; brackets; nipples; ladders; non-luminous, non-mechanical signs; and wire baskets for commercial and industrial use, all such goods being made entirely or primarily of metal; Int. Class 6 |
| 1,182,050 | 12/15/81 | 00/00/27 | Printed materials-namely, automobile owners' manuals; Int. Class 16 |
| 1,213,282 | 10/19/82 | 00/00/27 | Rubber supports for motors/engines, reflex tape, oil sealing gaskets, felt rings, stuffings for engines/motors and machines, sealing compound, sound insulation materials, nonmetallic tubes, pipe connection parts for vehicle radiator systems; Int. Class 17 |
| 1,213,179 | 10/19/82 | 00/00/27 | Headlights, parking lights, heating and air conditioning units, and ventilators all for land vehicles; Int. Class 11 |
| 1,159,752 | 07/07/81 | 00/00/27 | Manually handled lifting jacks, rim crosses, ice scrapers, hand tools for vehicle repair and service; Int. Class 8 |

Case 1:00-cv-00238-LHT    Document 1    Filed 10/10/00    Page 16 of 80

| Registration No. | Registration Date | Date of First Use | Goods and Services |
|---|---|---|---|
| 1,267,731 | 02/21/84 | 00/00/27 | Electric batteries, compasses, capacitors, relays, electronic time relays, switches, fuses, electrical contacts, electrical sockets, electrical cigarette lighters, radio sets, tape players, loudspeakers, interference suppressors, aerials, antennas, measuring instruments for fuel, oil pressure, tyre pressure, compressed air, temperatures, amperage, speed and engine revolutions, mileage recorders, time recorders, rudder indicators, instrument panels, thermostats, signal lamps; dynamometers, brake testers, diagnostic and testing instruments for use in connection with repair and analyzing automotive motors; automatic alarm units, warning reflectors; fire extinguishing apparatus, electronic monitors and regulators for engine and motors; Int. Class 9 |
| 974,197 | 11/27/73 | 00/00/38 | Automotive repair service; Int. Class 37 |
| 967,983 | 09/11/73 | 00/00/50 | Paint; Int. Class 2 |
| 967,939 | 09/11/73 | 00/00/50 | Anti-freeze compound; Int. Class 1 |
| 967,923 | 09/11/73 | 00/00/59 | Auto wax and auto polish; Int. Class 3 |
| 1,159,454 | 06/30/81 | 00/00/66 | Leasing of vehicles; Int. Class 39 |
| 1,164,992 | 08/11/81 | 06/00/73 | Education and entertainment services-namely, conducting a tennis tournament; Int. Class 41 |
| 1,627,262 | 12/11/90 | 00/00/75 | Clothing, namely-caps, sweaters, shirts and jackets; Int. Class 25 |
| 1,506,329 | 09/27/88 | 05/06/87 | Financing services; Int. Class 36 |
| 1,815,680 | 01/11/94 | 00/00/89(Cl. 7) 00/00/72(Cl. 12) | Marine motors and transmissions; namely, inboard/outboard drive units and sailing boat drive units for inboard engines; Int. Class 7 Vehicles; namely, automobiles, over the highway trucks and tractors; and parts therefor; namely, grills; Int. Class 12 |

Copies of the PTO certificates of registration evidencing the VOLVO Trademark Registrations are attached as Exhibit F.

23. Effective February 26, 1999, the VOLVO Trademark Registrations were assigned from AB Volvo to Volvo Trademark. A copy of the Trade Mark Assignment between AB Volvo and Volvo Trademark is attached as Exhibit G. The assignment was recorded with the PTO on October 10, 2000 by way of the Recordation Form attached as Exhibit H.

- 17 -

24.    On February 28, 1999, Volvo Trademark and AB Volvo entered into the AB Volvo Trade Marks Licence Agreement attached as Exhibit I (the "Volvo Group VOLVO Marks License"). Pursuant to the Volvo Group VOLVO Marks License, Volvo Trademark granted AB Volvo an exclusive license to use the VOLVO Marks except with respect to the "Volvo Cars Licensed Products" as that term is defined therein. Among the obligations of AB Volvo pursuant to the Volvo Group VOLVO Marks License are "to ensure that all products and services provided under the Volvo Trade Marks pursuant to this Agreement comply with standards of quality satisfactory to Licensor [Volvo Trademark]." Exhibit I ¶ 3.1.4. Under the Volvo Group VOLVO Marks License, Volvo Construction is a "Group Company" covered by the provisions of the license. Pursuant to the Volvo Group VOLVO Marks License, AB Volvo has authorized Volvo Construction to use the VOLVO Marks in conjunction with the manufacture and sale of construction equipment. However, it has not yet authorized Champion Road to do so.

25.    In the United States, the VOLVO Marks and their predecessors and variants (including "VOLVO BM") have been used by Volvo Construction and its predecessors since 1986 to identify construction equipment. Based on a Swedish registration dated June 18, 1971, Volvo Trademark has filed with the PTO an application to register the VOLVO Marks in International Classes 7 and 12 for use with construction equipment. A copy of this application, which was filed on October 10, 2000, is attached as Exhibit J.

26.    Beginning in January 2001, Volvo Construction intends to use the VOLVO Marks to identify motor graders. Initially, the motor graders bearing the VOLVO Marks will be — except for their branding — indistinguishable from those previously sold under the CHAMPION Trademark.

**(The Importance of the VOLVO Marks
to the Business of Volvo Construction)**

27.     The VOLVO Marks date back to 1927, when they were first used to identify automobiles in Sweden. From the outset, the founders of what is now AB Volvo have sought to have quality and safety associated with the VOLVO Marks. In the words of the founding fathers of what is now AB Volvo, Assar Gabrielsson and Gustaf Larson:

> An automobile is made by and for people. The basic principle for all manufacturing is and must remain: safety. . . . On this point, we are proud to be conservative. And even in the future this will remain our guiding light.

The Volvo Brand Management Policy (copy attached as Exhibit K), from which the foregoing quotation was taken, also sets forth "strict quality principles for the design, production and control of Volvo products." Exhibit K at 7.

28.     Today, according to the Volvo Brand Management Policy, "Volvo is one of the world's best known and most respected brand names. The privilege to use the trademark entails a responsibility to foster, develop, and control the brand and its values, and to protect it. Our success lies in our ability to ensure that the Volvo brand remains distinct and differentiated." *Id.* at 5.

29.     The equity that has, over the years been built up in association with the VOLVO Marks, is among the most valuable assets of AB Volvo and all of its direct and indirect subsidiaries (collectively, the "Volvo Group"). In the words of the Volvo Brand Management Policy:

> The equity of a brand lies in its heritage as well as its distinctive added value which stems from functional, emotional and social benefits. The world's strongest brands result from dedicated nurturing of specific core values that are never deviated from, regardless of possible sacrifices, over a considerable period of time. Consistency is key.

*Id.* at 10-11. The competitive advantages of a strong brand include, according to the Volvo Brand Management Policy, the following:

- Enhanced customer confidence in the purchase decision (reason-to-buy)
- Enhanced customer satisfaction and loyalty (reason-to-stay)
- Scale advantages in communication and marketing programs
- Pricing based on added value
- Reduced vulnerability to competitive attacks
- Trade leverage through attractiveness and trustworthiness
- Transfer of values from old to new products and services
- Internal motivation, commitment and loyalty

*Id.* at 9.

30.     The VOLVO Marks are "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

31.     The core values which the Volvo Group has sought to nurture and have associated with the VOLVO Marks are quality, safety, and environmental care. These core values are reflected in the Brand Strategy statement set forth in the Volvo Brand Management Policy:

> *Based on customer-perceived quality and achievements, Volvo will distinctly, decisively and consistently*
>
> - *sustain and develop its brand position as a recognized leader in safety and*
>   *. . .*
>
> - *be ranked as a leader in terms of environmental care among the world's top producers of automotive and transport products, equipment and systems.*

*Id.* at 12 (emphasis in original).

32.     To help implement the foregoing brand strategy, the Volvo Group has in place a Volvo Brand Management Structure, as described in the Volvo Brand Management Policy. The Volvo Brand Management Policy is guided by the three principles of **consistency**, **continuity**, and **credibility**:

Case 1:00-cv-00238-LHT     Document 1     Filed 10/10/00     Page 20 of 80

Without *"Consistency"*, no one will ever understand the Volvo brand and what it stands for. Instead, they will create their own opinion from all the random data they receive.

Without *"Continuity"*, the brand will come and go in the night, in the minds of the Volvo target audiences. The battle for a place in the audience's minds against the competition is a continuous one. Any letup just opens the door to others.

Without *"Credibility"*, the Volvo messages will get through, but will then be discarded along with all other messages that do not fit the values of the target audience. Trying to appear to be someone one is not is a sure way to fail. One must be true to the Brand Platform and true to the Volvo Brand Values despite the temptation to do otherwise for short-term gains.

*Id.* at 22 (emphasis in original).

33.    The Volvo Brand Management Policy recognizes the role of visual identity in protecting the VOLVO Marks and ensuring that they reflect the desired core values. *Id.* at 25-26. The desired appearance of the VOLVO Marks is spelled out in greater detail in the Volvo Trademark Policy, a copy of which is attached as Exhibit L.

34.    The Volvo Trademark Policy also recognizes the importance of imposing restrictions on the operations of independent dealers and their use of the VOLVO Marks: "Much public recognition and goodwill begins with Volvo dealerships. They are a crucial means of projecting the company's brand values." *Id.* § 9.01.

### (Federal Law Protection of the Volvo Plaintiffs' Right to Control Dealer Use of the VOLVO Marks)

35.    The provisions of the Volvo Trademark Policy regarding control of dealer operations are consistent with numerous federal court precedents recognizing the importance of franchisor control over franchisee operations to the success of a franchise system. The relationships between Volvo Construction and its independent dealers and the relationships between Champion Road and its independent dealers are not "franchises" within the meaning of federal and state law. However, these dealer relationships are similar in that — like a franchise

system — a trademark is their "cornerstone." *Susser v. Carvel Corp.,* 206 F. Supp. 636, 640 (S.D.N.Y. 1962), *aff'd,* 332 F.2d 505 (2d Cir. 1964), *cert. dismissed,* 381 U.S. 125 (1965). In a franchise system, "uniformity of product and control of its quality and distribution ... causes the public to turn to franchise stores for the product." *Id.* Similarly, in the case of construction equipment sold under the VOLVO Marks, "uniformity of product and control of its quality and distribution ... causes the public to turn to [independent dealers licensed to use the VOLVO Marks] for the product."

36.    The Fourth Circuit has long recognized that, in a franchise system, "[p]ervasive franchisor supervision and control benefits the franchisee" by identifying the franchisee "with a network of stores whose very uniformity and predictability attracts customers." *Principe v. McDonald's Corp.,* 631 F.2d 303, 309 (4th Cir. 1980), *cert. denied,* 451 U.S. 970 (1981). Similarly, supervision and control of Volvo Construction dealers licensed to use the VOLVO Marks benefits the dealers. The dealers benefit by association with a network of independent dealers whose operations are consistent with the core values that the Volvo Brand Management Policy seeks to have associated with the VOLVO Marks.

37.    The need for Volvo Trademark and its affiliates to control the quality and uniformity associated with the VOLVO Marks is expressly recognized in the Lanham Act. The Lanham Act prohibits any use of the federally registered VOLVO Marks by anyone except Volvo Trademark and a "related company." 15 U.S.C. §§ 1051, 1055. Section 45 defines "related company" as "any person who legitimately controls or *is controlled by*" the trademark owner "*in respect to the nature and quality of the goods or services in connection with which the mark is used.*" *Id.* § 1127 (emphasis supplied). Section 45 thus grants Volvo Trademark and its affiliates the *right* to control the quality of goods and services associated with the VOLVO

Marks. In fact, Section 45 imposes upon Volvo Trademark, Volvo Construction, and every other affiliate that uses the VOLVO Marks an **affirmative duty** to do so. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977).

38. Under Section 45 of the Lanham Act, "it is the **control** of quality that a trademark owner is entitled to maintain."' *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991), *quoting El Greco Leather Prods. Co.* v. *Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986), *cert. denied*, 484 U.S. 817 (1987) (emphasis supplied). *See also Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F. Supp. 243, 279-80 (E.D. Pa. 1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980), *cert. denied*, 451 U.S. 911 (1981); *Gilderhus v. Amoco Oil Co.*, 1980-1 Trade Cas. (CCH) ¶ 63,650 (D. Minn. 1980).

39. Under the Fourth Circuit's decision in *Shell Oil v. Commercial Petroleum* and the prior federal court decisions upon which it is based, the fact that motor graders identified with the CHAMPION Trademark may — except for their branding — be identical to motor graders to be sold under the VOLVO Marks is "irrelevant." Under such precedents, the CHAMPION Trademark Licensees are not entitled to use the VOLVO Marks. Under such precedents, the CHAMPION Trademark Licensees are not licensed to sell motor graders that were branded with the CHAMPION Trademark under the VOLVO Marks or vice versa. Nor do such precedents allow the CHAMPION Trademark Licensees to identify themselves as VOLVO dealers or otherwise use the VOLVO Marks. Any court order directing that the CHAMPION Trademark Licensees are authorized to sell motor graders under the VOLVO Marks or to call themselves VOLVO dealers would deprive Volvo Trademark, Volvo Construction, and their affiliates of their right under Section 45 of the Lanham Act to control the quality of goods and services associated with the VOLVO Marks. Such an order would also force Champion Road to license

or sublicense the VOLVO Marks to the CHAMPION Trademark Licensees and Other Potential Defendants even though Volvo Trademark has not authorized Champion Road to do so. Such an order would also be inconsistent with federal law in that, with respect to the VOLVO Marks, Champion Road is *not* a "related company" within the meaning of Section 45 of the Lanham Act.

40.     In addition to granting Volvo Trademark and its affiliates the *right* to control the quality of goods and services associated with the VOLVO Marks, Section 45 states congressional intent to expressly preempt inconsistent state law: "The intent of this chapter is . . . to protect registered marks used in [interstate] commerce from interference by State, or territorial legislation . . . ." 15 U.S.C. § 1127. As the Fourth Circuit has previously recognized, Section 45 preempts any provision of state law that would otherwise erode the trademark protection afforded by the Lanham Act. *Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1284 (4th Cir. 1987).

41.     If any state law were to deprive Volvo Trademark, Volvo Construction, or their affiliates of the ability to control the quality and uniformity associated with the VOLVO Marks, such a law would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Lanham Act. *Hines v. Davidowitz*, 312 U.S. 52, 67-68 (1941). If any state law were interpreted or applied so as to force Volvo Trademark to license the VOLVO Marks to Champion Road and force Champion Road to sublicense the VOLVO Marks to the CHAMPION Trademark Licensees and the Other Potential Defendants, such a law would — by virtue of its inconsistency with the Lanham Act — "frustrate a federal purpose" and therefore would be preempted by the Supremacy Clause. *International Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987).

**(The Contractual Right of Volvo Construction to Control
the Quality and Uniformity Associated With the VOLVO Marks)**

42.     The need for Volvo Trademark and Volvo Construction to control the use of the

VOLVO Marks by independent dealers — as recognized in the Volvo Trademark Policy, the

Lanham Act, and various federal court decisions applying franchise and trademark law — is also

reflected in numerous provisions of the contracts between Volvo Construction and its

independent dealers. Until recently, most Volvo Construction dealers who were authorized to

sell and service construction equipment under the VOLVO Marks did so pursuant to the

Distributor Agreement attached as Exhibit M (the "Old VOLVO Trademark License"). More

recently, independent Volvo Construction dealers in the NAFTA Region have been asked to sign

the Dealer Agreement attached as Exhibit N (the "New VOLVO Trademark License").

43.     Both the Old VOLVO Trademark License and the New VOLVO Trademark

License contain a number of provisions whereby the independent dealers are licensed to use the

VOLVO Marks. Such provisions of the Old VOLVO Trademark License include the following:

a.      ¶ 1, whereby the Distributor is appointed as an authorized distributor for

the "Products," each of which is defined as "a complete machine of the type specified in

the Product Schedule manufactured or sold by the MANUFACTURER, or

MANUFACTURER's Affiliates[1] *under one or more of the MANUFACTURER's or its*

*Affiliate's trademarks*." (Exhibit A to Old VOLVO Trademark License ¶ 3.2) (emphasis

---

[1] The Old VOLVO Trademark License defines "MANUFACTURER's Affiliates" as
"companies which manufacturer or sell the Products *pursuant to a license, trademark
agreement or other agreement* with the MANUFACTURER, its parent, its subsidiaries or
subsidiaries of its parent." (Exhibit A to Old VOLVO Trademark License ¶ 3.4) (emphasis
supplied).

supplied), and "Parts," defined as "replacement parts for Products" (*id.* ¶ 3.3), in the "Territory," defined as "the geographic area or territory or other area specified in the Product Schedule of the applicable Agreement" (*id.* ¶ 3.6);

      b.     the "Exterior Signage Provision," whereby the Distributor "agrees to the placement of an approved Volvo pillar sign and/or wall sign" at each of its locations (Exhibit A to Old VOLVO Trademark License ¶ 8); and

      c.     the "Trademark License Provision," which states as follows:

> DISTRIBUTOR is authorized, during the term of this Agreement, to use on and in conjunction with the sale and servicing of MANUFACTURER's Products and Parts *trademarks and service marks of the MANUFACTURER and its Affiliates which are specified for use with such Products, Parts and servicing. In addition to using the applicable trademarks on the Products and Parts, the DISTRIBUTOR may use said trademarks on sales and service facilities for said Products, on buildings and vehicles, and on signs, letterheads, business cards, telephone directory advertising and other advertising and promotional materials which are used to promote the MANUFACTURER's Products and Parts and the servicing thereof subject to the following conditions: All use of such trademarks shall be in a manner acceptable to MANUFACTURER and the form of the trademarks shall be that prescribed by the MANUFACTURER or approved by it.* DISTRIBUTOR is authorized to use such trademarks only: (1) on sales or service facilities within the Territory: (2) on sales or service facilities or on promotional materials which are used exclusively for the sale, service, or promotion of the Products and Parts or if not used exclusively in conjunction with the MANUFACTURER's Products and Parts or the servicing thereof, then such use can only be in conjunction with products and parts which do not compete with the MANUFACTURER's Products and Parts and which do not promote trademarks which are used on competitive products. DISTRIBUTOR is not authorized to use any of MANUFACTURER's trademarks in DISTRIBUTOR's company name, divisional name or in the name of any of DISTRIBUTOR's subsidiaries or in any other name used in the conduct of DISTRIBUTOR's business unless prior express written consent for such use has been obtained from the MANUFACTURER.

(Exhibit A to Old VOLVO Trademark License ¶ 18) (emphasis supplied). Such provisions of the New VOLVO Trademark License include the following:

a. ¶ 2.1, whereby the Dealer is appointed as Volvo Construction's "authorized dealer" of certain specified "Volvo Products" in the "Territory" specified therein;

b. ¶ 2.2, whereby the Dealer agrees "to use its best efforts to promote the sale, rental, leasing, service, goodwill and image of the Volvo Products within the Territory;" and

c. the "Trademark License Provision," which provides as follows under the heading "The Volvo Brand":

13.1 *Both Volvo and the Dealer acknowledge that the brands owned or otherwise controlled by the Volvo Group represent one of the key strengths of Volvo and that their joint commitment to safeguard and further enhance the brands' strength is of the utmost importance. At the same time, the Dealer recognizes that the Volvo CE Property Rights are owned by the Volvo Group.*

13.2 *During the Contract Period, the Dealer may use the Trademarks actively in the fulfillment of its obligations hereunder and in strict accordance with the Volvo Corporate Identity Manual, as amended from time-to-time. Any violation of the provisions of the Volvo Corporate Identity Manual shall be deemed to constitute a breach of this Agreement. Dealer is authorized to use the Trademarks on sales or service facilities within the Territory. Dealer is not authorized to use any of the Trademarks in Dealer's company name or the name of any division, subsidiary or affiliate unless authorized in writing by Volvo.*

13.3 The Dealer shall not register, have registered or use, either during or after the Contract Period, any Trademark or any word, symbol, identifying mark or name resembling the Trademarks which could conceivably cause confusion or deception in respect of any of the Volvo Products or related services in the Territory or elsewhere.

13.4 Any and all rights to use the Trademarks shall cease automatically upon the Termination Date. The Dealer shall be responsible for, and shall take appropriate action to ensure the observance of this Article 13 by its employees, servants, dealers, workshops, agents.

13.5 The Dealer shall have the continuing obligation to assign to the Volvo Group, without compensation, all rights of record or otherwise that the Dealer has obtained or may obtain with respect to any Volvo CE Property Right, including

the Trademarks, and shall take such other action as Volvo may require in order to confirm the Volvo Group's ownership thereof and of the goodwill associated therewith.

13.6    The Dealer shall notify Volvo in writing of any infringement of the Volvo CE Property Rights within the Territory that comes to its attention, including, but not limited to, the unauthorized use of any word, symbol, identifying mark or name resembling the Trademarks.  If so requested by Volvo, the Dealer shall assist Volvo in any investigations in which such companies may become involved due to any alleged misuse or infringement of the Volvo CE Property Rights. Volvo shall reimburse Dealer for its reasonable costs and expenses associated with any such requested assistance.

13.7    This Agreement does not give the Dealer the right to use the Volvo CE Property Rights in connection with the manufacture, remanufacture or assembly of components or otherwise confer on the Dealer the right to manufacture, remanufacture or assemble any of the Volvo Products.  Any such manufacture, remanufacture or assembly shall require a separate written license and quality assurance agreement between the Parties.

13.8    Volvo shall not be liable for damages suffered by the Dealer as a result of infringement by a third party of any Volvo CE Property Right.

13.9    During the Contract Period and at all times thereafter, Volvo shall defend, indemnify and hold harmless Dealer from and against all claims, demands, lawsuits, liabilities, losses, damages, and reasonable legal fees made against or incurred by Dealer, caused by or resulting from any allegation that any Volvo Products or any Volvo CE [P]roperty Right conflicts with or infringes upon any patent, trademark, copyright or trade secret of any person.

(New VOLVO Trademark License Article 13) (emphasis supplied).

44.    The Trademark License Provisions of both the Old VOLVO Trademark License and the New VOLVO Trademark License are not the only contractual provisions whereby Volvo Construction controls the quality and uniformity of dealer operations associated with the VOLVO Marks.    The provisions of the Old VOLVO Trademark License whereby Volvo Construction has the contractual right to control various aspects of dealer operations include the following:

a.    ¶¶ 1, 2, and 3, containing designations of the Distributor's Territory, facilities within the Territory, and key personnel, respectively;

b.    ¶ 4.1, whereby the Distributor "agrees to use its best efforts to maximize the sale of Products and Parts throughout the Territory;"

c.    ¶ 5.1, whereby the Distributor is obligated to perform "Delivery Service" in accordance with the provisions of the Old VOLVO Trademark License;

d.    ¶ 5.2, whereby the Distributor is obligated to perform "Warranty Service" in accordance with the provisions of the Old VOLVO Trademark License;

e.    ¶ 5.3, whereby the Distributor is obligated to perform "Regular Service" in accordance with the provisions of the Old VOLVO Trademark License;

f.    ¶ 5.4(a), whereby Volvo Construction establishes "standards and criteria for Delivery, Warranty, and Regular Service," including standards to ensure that Distributor "maintains adequate facilities, tools and equipment;"

g.    ¶ 5.4(b), whereby the Distributor agrees that at least two of its personnel, or 30 percent of its technicians, will have been factory trained by Volvo Construction, and also agrees to participate in Volvo Construction's Master Guild and Service Manager Programs;

h.    ¶ 5.5, whereby the Distributor agrees "to prepare and implement service marketing business plans for receiving new and maintaining existing business," to prepare and submit reports in accordance with Volvo Construction's "Distribution Service Manual," and to submit monthly service marketing activity reports "identifying service parts and labor sales;"

i.      ¶ 6, whereby Volvo Construction retains the right to approve changes in ownership or key personnel;

j.      ¶ 7, whereby the Distributor agrees to maintain the business facilities specified in the Old VOLVO Trademark License and "not to use, maintain or establish, directly or indirectly, any additional facilities or premises for the sale, display, rental, lease or service of Products or Parts without prior written approval of" Volvo Construction;

k.      ¶ 10, whereby Volvo Construction retains the right to specify the computer hardware and software to be used by the Distributor;

l.      ¶ 17, whereby the Distributor agrees only to use parts approved by Volvo Construction and to install them in accordance with Volvo Construction's specifications;

m.      ¶ 30, whereby Volvo Construction provides, *inter alia*, "technical, engineering and sales advice" and "assistance and advice concerning promotional and training programs;" and

n.      ¶ 31, whereby Volvo Construction provides "professional advice on the form and placement of advertisements, and on preferred mediums."

Similarly, the following provisions of the New VOLVO Trademark License grant Volvo Construction the contractual right to control various aspects of dealer operations:

a.      Article 3, which sets forth various obligations with respect to "sales and product support," including (i) the obligation to "use its best efforts to maximize the sale of Volvo Products in the Territory" (¶ 3.1); (ii) the obligation to "provide the organization and product support services described in the Parts Policy and Procedures Manual and Service Policy and Procedures Manual" (¶ 3.2); (iii) the obligation to "establish and

Case 1:00-cv-00238-LHT    Document 1    Filed 10/10/00    Page 30 of 80

maintain a sales and after sales support organization adequate to meet its obligations under this Agreement, including suitable, modern facilities, adequate capitalization, working capital and sufficient and properly trained personnel" (¶ 3.3); (iv) the obligation to "at all times maintain a stock of Volvo Products sufficient in quantity and range to ensure prompt delivery of such Volvo Products to customers within the Territory" (¶ 3.3); (v) the obligation to "provide prompt and efficient after-sales support and warranty services with respect to all Volvo Products used within the Territory" (¶ 3.4); (vi) the obligation to operate only from facilities whose location has been approved by Volvo Construction (¶ 3.5); and (vii) the obligation to provide "after-sales support and warranty services…in accordance with the requirements of the Service Policy and Procedures Manual" (¶ 3.5);

  b.  Article 5, whereby the Dealer agrees to participate in Volvo's Circle of Excellence Program and is required to submit to Volvo Construction a "Business Plan" that complies with the "Circle of Excellence Program" and to obtain Volvo Construction's approval of such Business Plans (¶ 5.1);

  c.  ¶ 10.1, requiring the Dealer to maintain certain equipment necessary for exchanging information with Volvo Construction;

  d.  Article 11, whereby the Dealer is required to (i) "provide sales and marketing information and market information with respect to Dealer's Territory" (¶ 11.1); (ii) to provide prior notice "of any material change in its business, management, organization, control or capital structure" (¶ 11.2); and (iii) to submit financial statements (¶ 11.3);

- 31 -

e. Article 12, whereby the Dealer is prohibited from either directly or indirectly (i) manufacturing, assembling, selling, renting, or leasing "any products competing with the Volvo Machines or the Volvo Parts" (¶ 12.1) or (ii) buying new Volvo Machines or Volvo Parts from anyone other than Volvo Construction (¶ 12.2); and

f. ¶ 14.1, requiring the Dealer to ensure that its advertising and promotional materials comply with the Volvo Identity Manual.

45. The CHAMPION Trademark Licensees and the Other Potential Defendants are not parties to the Old VOLVO Trademark License, the New VOLVO Trademark License, or any other contract whereby they have been licensed to use the VOLVO Marks. Rather, each of the CHAMPION Trademark Licensees and the Other Potential Defendants has been licensed by Champion Road to use the CHAMPION Trademark pursuant to the Champion Dealer Agreements.

## (The CHAMPION Trademark License Provisions of the Champion Dealer Agreements)

46. The CHAMPION Trademark has been registered on the Principal Register of the PTO in Class 7 as Registration Number 973,926 (the "CHAMPION Trademark Registration") for the following goods: "road equipment — namely, road graders and related attachments, namely: bulldozers, rippers, scarifiers, snow plows, snow wings, belt loaders, shoulder slopers, mower and brush cutters, windrow eliminators, berm levellers, snow gates, push blocks, grader rops." Champion Road is the owner of the CHAMPION Trademark Registration. A copy of the CHAMPION Trademark Registration is attached as Exhibit O.

47. Each of the Champion Dealer Agreements contains the following provision:

Dealer acknowledges Champion's exclusive right, title and interest in and to the trademark "Champion" and all other trademarks or trade names of

- 32 -

Champion and any of its affiliates and will not, at any time, do or cause to be done any act or thing, directly or indirectly, contesting, or in or any way, impairing, or tending to impair, any part of Champion's right, title or interest in such trademarks or trade names. Dealer specifically acknowledges that it has no right, title or interest in such trademarks or trade names, and Dealer shall not, in any manner, represent that it has ownership interest in such trademarks or trade names, and Dealer shall, without reservation, render to Champion all assistance in connection with any matter pertaining to the protection of such trademarks or trade names within the APR or otherwise. *Dealer will not use any of the trademarks or trade names of Champion, or any affiliates of Champion*, in Dealer's company name, or in any divisional or other name under which Dealer's business is conducted, or in the name of any subsidiary, *unless prior written authorization has been received from Champion for each such use of such trade name or trademark. In addition, Dealer may not use any such trademark or trade name in any manner whatsoever without Champion's express written approval.* Without limiting the generality of the foregoing, Dealer is not authorized to use any trademarks or trade names, now or hereafter owned by Champion or any affiliate, outside Dealer's APR: (a) on salesrooms or service facilities for products; or (b) on letterheads, signs or other advertising or promotional materials indicating a salesroom or service facility outside such APR; or (c) as a part of Dealer's trade style or corporate name on salesrooms or service facilities for products. Upon any termination of this Agreement, Dealer shall immediately cease using any and all trademarks and trade names of Champion and its affiliates.

(AIS Champion Dealer Agreement ¶ 18, CLM Champion Dealer Agreement ¶ 18, FEC Champion Dealer Agreement ¶ 18, NPE Champion Dealer Agreement ¶ 18) (emphasis supplied).

48.     At no time has either Champion Road or Volvo Construction granted "express written approval" to any use of the VOLVO Marks by the CHAMPION Trademark Licensees or Other Potential Defendants. Moreover, there are a number of express provisions of the Champion Dealer Agreements that would bar any claim that (a) the VOLVO Marks have been licensed to the CHAMPION Trademark Licensees or Other Potential Defendants on an implied or oral basis, (b) the CHAMPION Trademark Licensees and Other Potential Defendants are entitled to distribute motor graders under the VOLVO Marks, (c) neither Volvo Construction nor

Champion Road has any right to discontinue the manufacture or sale of motor graders under the CHAMPION Trademark or terminate the Champion Dealer Agreements.

**(The Claim Barring Provisions of the Champion Dealer Agreements)**

49.     Each of the Champion Dealer Agreements to which the CHAMPION Trademark Licensees is a party contains the following provisions, as those terms are defined herein:

      a.     the "Merger and Integration Clause;"

      b.     the "No Oral Modification Provision;"

      c.     the "No Inadvertent Waiver Provision;"

      d.     the "Severability Provision;"

      e.     the "Termination Without Cause Provision;"

      f.     the "No Liability for Termination Provision;" and

      g.     the "Market Withdrawal Provision."

Set forth in the paragraphs that follow is a description of each of the foregoing provisions (collectively, the "Claim Barring Provisions") of the Champion Dealer Agreements.

50.     The "Merger and Integration Clause" states that "[t]his Agreement and [any] accompanying Exhibits contain the entire and only agreement between the parties respecting the sale to and the purchase and distribution by [the CHAMPION Trademark Licensee] of Products and Parts, and any representations, terms or conditions in connection therewith not incorporated herein shall not be binding upon either party." (AIS Champion Dealer Agreement ¶ 32.1, CLM Champion Dealer Agreement ¶ 32.1, FEC Champion Dealer Agreement ¶ 33.1, NPE Champion Dealer Agreement ¶ 33.1). The Merger and Integration Clause also states that "[t]his Agreement wholly cancels, terminates and supersedes any agreement heretofore entered into between the parties, or their successors or assigns, pertaining to Products and Parts." (*Id.*)

- 34 -

51.     The "No Oral Modification Provision" states that "[t]his Agreement, and any modification, renewal, waiver, extension or termination hereof, shall not be valid unless in writing and signed by a duly authorized officer of Champion." (AIS Champion Dealer Agreement ¶ 32.2 (omitting the word "waiver), CLM Champion Dealer Agreement ¶ 32.2 (omitting the word "waiver"), FEC Champion Dealer Agreement ¶ 33.2, NPE Champion Dealer Agreement ¶ 33.2).

52.     The "No Inadvertent Waiver Provision" states that "[f]ailure of either party, at any time, to require performance of any provision shall not affect the right to require full performance thereof at any time thereafter, and the waiver by either party of a breach of any such provision shall not constitute a waiver of any subsequent breach thereof or nullify the effectiveness of such provision. No waiver whatever shall be valid, unless in writing and signed by the party against which enforcement of the waiver would be sought, and then only to the extent therein set forth." (AIS Champion Dealer Agreement ¶ 31, CLM Champion Dealer Agreement ¶ 31, FEC Champion Dealer Agreement ¶ 32, NPE Champion Dealer Agreement ¶ 32).

53.     The "Severability Provision" states that "[t]he invalidity or unenforceability of any provision of this Agreement shall not invalidate or render unenforceable any other provision hereof." (AIS Champion Dealer Agreement ¶ 33, CLM Champion Dealer Agreement ¶ 33, FEC Champion Dealer Agreement ¶ 34, NPE Champion Dealer Agreement ¶ 34).

54.     The "Termination Without Cause Provision" grants Champion Road the right to terminate without cause upon 60 days written notice (*see* AIS Champion Dealer Agreement ¶ 24.4, CLM Champion Dealer Agreement ¶ 24.4, FEC Champion Dealer Agreement ¶ 24.4, NPE Champion Dealer Agreement ¶ 24.4).

55.    The "No Liability for Termination Provision" states that "[n]either Champion nor [the CHAMPION Trademark Licensee] shall, by reason of any termination or non-renewal of this Agreement, be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales, or on account of expenditures, investments, leases, property improvements, or commitments in connection with the business or good will of Champion, of the [CHAMPION Trademark Licensee], or otherwise. IN NO EVENT SHALL CHAMPION BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER." AIS Champion Dealer Agreement, ¶ 24.6, CLM Champion Dealer Agreement ¶ 24.6, FEC Champion Dealer Agreement ¶ 24.6, NPE Champion Dealer Agreement ¶ 24.6 (emphasis in original).

56.    The "Market Withdrawal Provision" states that "*Champion reserves the right at any time to* change models, classification of models and specifications, or add to or *discontinue any products or product lines without notice* to [the CHAMPION Trademark Licensee] and without incurring any obligation to incorporate such changes in any other products." AIS Champion Dealer Agreement, ¶ 27, CLM Champion Dealer Agreement ¶ 27, FEC Champion Dealer Agreement ¶ 27, NPE Champion Dealer Agreement ¶ 27 (emphasis supplied).

57.    Each of the Champion Dealer Agreements contains the foregoing Claims Barring Provisions. However, the Champion Dealer Agreements are *not* uniform with respect to whose law governs and the forum in which contractual disputes must (or may) be resolved.

### (The Varying Choice of Law and Forum Provisions of the Champion Dealer Agreements)

58.    Certain Champion Dealer Agreements, including those of FEC and NPE, contain the following "Canadian Forum Selection Provision":

This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the Province of Ontario.

***Each of Champion and Dealer hereby irrevocably agrees to submit to the jurisdiction of the courts of the Province of Ontario and agrees that such courts shall have the exclusive jurisdiction to settle any claims, differences or disputes which may arise out of or in connection with this Agreement.*** Each of Champion and Dealer irrevocably waives any objection it may now or hereafter have to the laying of the venue of any proceedings under this Agreement in any court described in the preceding sentence.

FEC Champion Dealer Agreement ¶ 29, NPE Champion Dealer Agreement ¶ 29 (emphasis supplied).

59.    Other Champion Dealer Agreements, including those of AIS and CLM, contain the following "South Carolina Choice of Law Provision":

This Agreement has been formalized in South Carolina, and the rights, duties and obligations of the parties as set forth herein shall be determined according to the laws of the State of South Carolina.

AIS Champion Dealer Agreement ¶ 29, CLM Champion Dealer Agreement ¶ 29. At the time that the various Champion Dealer Agreements containing the South Carolina Choice of Law Provision were executed, Champion Road had its principal place of business in West Columbia, South Carolina. At that time, South Carolina therefore bore a reasonable relationship to the transactions contemplated by the Champion Dealer Agreements. However, Champion Road no longer maintains its principal place of business in South Carolina. Moreover, those Champion Dealer Agreements that contain a South Carolina Choice of Law Provision are silent as to the *forum* in which disputes are to be resolved.

60.    Regardless of whether it contains the Canadian Forum Selection Provision or the South Carolina Choice of Law Provision, each Champion Dealer Agreement contains the following "Conformity with Local Law Provision":

The rights and obligations of the parties hereto shall be subject to all applicable laws, orders, regulations, directions, restrictions and limitations of governments and governmental agencies having jurisdiction over the parties hereto.

In the event that any law, order, regulation, direction, restriction or limitation, appropriation, seizure or interpretation thereof shall, in the judgment of either party hereto, substantially alter the relationship between the parties under this Agreement or the advantages derived from such relationship, either party may request the other party hereto to modify this Agreement. If, within fifteen (15) days subsequent to making such request, the parties hereto are unable to agree upon a mutually satisfactory modification hereof, then the adversely affected party may terminate this Agreement on fifteen (15) days' notice given to the other party.

AIS Champion Dealer Agreement ¶ 30, CLM Champion Dealer Agreement ¶ 30, FEC Champion Dealer Agreement ¶ 30, NPE Champion Dealer ¶ 30.

61.    Each of the CHAMPION Trademark Licensees contends that termination of its Champion Dealer Agreement violates the law of its home state. However, none of the CHAMPION Trademark Licensees has ever requested modification of its Champion Dealer Agreement pursuant to the Conformity With Local Law Provision. Instead, each of the CHAMPION Trademark Licensees seeks to have a court modify its Champion Dealer Agreement without affording either Volvo Construction or Champion Road the right of termination afforded by the Conformity With Local Law Provision. If allowed to succeed in this effort, the CHAMPION Trademark Licensees would be depriving Champion Road of the benefit of its bargain under the Champion Dealer Agreements. In addition, they would be interfering with the ongoing "Volvoization" of the various product lines that the Volvo Construction Equipment Group has acquired from other construction equipment manufacturers and with Volvo Construction's ongoing "rationalization" of its dealer network.

**(The Ongoing "Volvoization" of Other Product Lines
and "Rationalization" of Volvo Construction's Dealer Network)**

62.     The March 27, 1997 acquisition of Champion Road was consummated for the purpose of adding motor graders to the product line of the Volvo Construction Equipment Group. The Champion Road acquisition was part of a business strategy developed by the Volvo Construction Equipment Group for the purpose of expanding its product offerings to become a broad range provider of heavy construction and material handling equipment.   In fact, the Champion Road acquisition was one in a series of acquisitions of construction equipment manufacturers by Volvo Construction Equipment N.V.

63.     Before acquiring Champion Road, Volvo Construction Equipment N.V. or its subsidiaries acquired Akemans Maskin AB (and its U.S. subsidiary, Akerman, Inc.), Groupe Pel-Job S.A., and Zettelmeyer GmbH.   In addition, Volvo Construction and Hitachi Construction Machinery Co., Ltd. are parties to a joint venture, Euclid-Hitachi Heavy Equipment, Inc., for the sale of heavy-duty construction and mining equipment.

64.     The Champion Road acquisition is not the most recent transaction by which Volvo Construction Equipment N.V. has acquired another manufacturer of construction equipment.   On or about July 1, 1998, the Volvo Construction Equipment Group  acquired the heavy construction equipment business of Samsung Heavy Industries Company, Ltd. ("Samsung").  The Samsung acquisition gave the Volvo Construction Equipment Group access to a line of excavators that was then being manufactured in South Korea by Samsung under its trademark.

65.     As a result of the acquisition of Champion Road and the other construction equipment manufacturers described in the foregoing ¶¶ 62-64, the Volvo Construction

- 39 -

Equipment Group now manufactures and sells the following products: excavators, wheel loaders, motor graders, articulated haulers, and compact equipment (excavators and wheel loaders). The various products sold by the Volvo Construction Equipment Group are used for materials handling, earthmoving, mining, forestry, industrial, and a wide variety of associated heavy construction equipment related work and applications.

66.     Each time that the Volvo Construction Equipment Group has acquired another manufacturer of construction equipment, it has eventually sought to "Volvoize" the construction equipment products of that manufacturer. The "Volvoization" process has included rebranding the construction equipment under the VOLVO Marks.

67.     Effective March 30, 1998, the Volvo Construction Equipment Group launched under the VOLVO Marks a series of compact wheel loaders that previously had been marketed under the trademark ZETTELMEYER. ZETTELMEYER was the brand name of another construction equipment manufacturer that the Volvo Construction Equipment Group had previously acquired in March 1990.

68.     Effective January 1, 2000, the Volvo Construction Equipment Group rebranded and introduced under the VOLVO Marks the Pel-Job line of compact or mini-excavators.

69.     Effective January 1, 2000, the Volvo Construction Equipment Group also introduced under the VOLVO Marks excavators that were in some respects comparable to models of Samsung excavators that were discontinued shortly before introduction of the "Volvoized" excavators.

70.     Each time that construction equipment has undergone the "Volvoization" process, the Volvo Construction Equipment Group has, *in its sole discretion*, decided what changes — if any — must be made to the construction equipment before it can be marketed under the VOLVO

Marks. For example, in the case of the Pel-Job line of mini-excavators, the "Volvoization" process entailed, among other things, changing warning stickers and mufflers to ensure that the equipment met Volvo's standards of safety and environmental responsibility. In the case of Samsung excavators, the "Volvoization" process was even more extensive, as described in the Declaration and Supplemental Declaration of M. Douglas Gunn, both of which are attached as Exhibit P.

71. Following the acquisition of other manufacturers of construction equipment, Volvo Construction has sought to "rationalize" its product distribution by eliminating overlaps between the pre-existing dealers of Volvo Construction and those of the acquired manufacturer. By consolidating its distribution network, Volvo Construction has sought to avoid the duplicative costs associated with maintaining separate dealers for the construction equipment products acquired from other manufacturers in addition to the pre-existing dealers of other Volvo Construction products. By consolidating distribution with dealers who are able to offer the full range of Volvo Construction products, Volvo Construction has also sought to be able to compete more effectively with larger heavy construction equipment manufacturers. These larger competitors include Case, Caterpillar, John Deere, and Komatsu. Volvo Construction's larger competitors are already able to offer a full line of heavy construction equipment through a single dealer in a particular geographic area. The consolidation of dealerships is an important part of Volvo Construction's strategy for competing more effectively in the North American marketplace. As stated in the Agency Agreement (*see* Exhibit A ¶ 1) between Volvo Construction and Champion Road, the consolidation is intended to "increase the market share of these products" and "increase interbrand competition in the market place."

- 41 -

72.     This dealer "rationalization" or consolidation process has not been limited to the CHAMPION Trademark Licensees and the Other Potential Defendants who are parties to the Champion Dealer Agreements.   For example, following the Samsung acquisition, Volvo Construction began a process — which is still underway — of eliminating territorial conflicts between Volvo Construction dealers and Samsung excavator dealers.   As part of the Samsung excavator dealer "rationalization" process, certain Volvo Construction dealers voluntarily relinquished distribution rights, certain Samsung excavator dealers voluntarily relinquished distribution rights, and other dealers were sent involuntary notice of termination.  In some cases, Volvo Construction dealers assumed distribution rights formerly held by Samsung excavator dealers.  In other cases, Samsung excavator dealers assumed distribution rights formerly held by Volvo Construction dealers.  In every case, Volvo Construction has sought to avoid litigation by negotiating a mutually agreeable termination of the distributorship.

73.     Notwithstanding Volvo Construction's efforts to negotiate settlements with dealers affected by the consolidation process, a number of Samsung dealers have filed suit.  In some cases, the Samsung dealers have filed suit notwithstanding the fact that Volvo Construction has not terminated their distributor agreements.   The dealers' allegations include that, by discontinuing the Samsung excavator product line, Volvo Construction has engaged in a *de facto* termination of their contracts.  In every case, the Samsung dealers who have filed suit have done so in contravention of the forum selection clauses in their respective contracts.  At this juncture, there are three such cases pending:  the "Connecticut Samsung Dealer Litigation," the "Arkansas Samsung Dealers Litigation," and the "Illinois Samsung Dealers Litigation."

**(The Connecticut Samsung Dealer Litigation)**

74.     The "Connecticut Samsung Dealer Litigation" began on March 15, 2000. That day, F&W Equipment Corporation ("F&W") filed a Complaint as well as a Motion for Preliminary Injunction against Volvo Construction in the United States District Court for the District of Connecticut. That case, styled *F&W Equipment Corp. v. Volvo Construction Equipment North America, Inc.*, is currently pending as No. 300CV00486-DJS. F&W subsequently filed an Amended Complaint (copy attached as Exhibit Q) that alleges seven causes of action:

    a.      Count 1 alleges a claim for a violation of the Connecticut Franchise Act, § 42-133E *et. seq.*;

    b.      Count 2 alleges a claim for breach of contract;

    c.      Count 3 alleges a claim for promissory estoppel;

    d.      Count 4 alleges a claim for breach of the covenants of good faith and fair dealing;

    e.      Count 5 alleges a claim for fraud;

    f.      Count 6 alleges a claim for violation of the Connecticut Unfair Trade Practice Act; and

    g.      Count 7 alleges a claim for negligent misrepresentation.

75.     The district court in the Connecticut Samsung Dealer Litigation conducted hearings on F&W's Motion for Preliminary Injunction on May 4, 2000, and July 7, 2000. A third hearing date has been scheduled for October 12, 2000.

**(The Arkansas Samsung Dealers Litigation)**

76.     The case of *Capital Ford New Holland, Inc., Cromeens, Hollomon, Sibert, Inc., d/b/a Cisco Ford Equipment, Con-Equip., Inc., Con-Equipment, Inc., FMS, Inc., Hammer Equipment Sales, Ltd., Keil Equipment Co., Inc., Korpan Tractor & Parts, and Performance Machinery Company v. AB Volvo, Volvo Excavators AB, Volvo Construction Equipment, NV, Volvo Construction Equipment North America, Inc., Samsung Heavy Industries Co., Inc., Samsung America, Inc., and Samsung Construction Equipment America Corporation* was filed in the Circuit Court of Pulaski County, Arkansas on March 10, 2000 as Court File No. CV 00 2222 (the "Arkansas Samsung Dealers Litigation"). The plaintiffs in the Arkansas Samsung Dealers Litigation waited to serve their complaint (a copy of which is attached as Exhibit R) until April 17, 2000, just before the plaintiff in the Connecticut Samsung Dealer Litigation was scheduled to be deposed.

77.     Each of the plaintiffs in the Arkansas Samsung Dealers Litigation sought relief for termination of its Samsung Dealer Agreement, the discontinuation of the Samsung excavator product line, and/or the failure of one or more defendants to supply excavators under the VOLVO Marks. Each of the plaintiffs in the Arkansas Samsung Dealers Litigation alleged breach of contract even though its Samsung Dealer Agreement expressly states that it (a) is "non-exclusive," (b) has an initial term of only two years, (c) is terminable "without cause" at any time upon 60 days' written notice, (d) does *not* "create any express or implied obligation on either party to renew or extend this Agreement," (e) disclaims consequential damages, including lost goodwill and lost profits, and (f) represents the "entire understanding of the parties" and can be amended only in writing. In addition to alleging breach of contract, each of the plaintiffs also

alleged various common law and statutory violations—including violation of the Illinois Franchise Disclosure Act of 1987.

78.     The plaintiffs in the Arkansas Samsung Dealers Litigation alleged violation of the *Illinois* Franchise Disclosure Act for two reasons.  First, each had signed a Samsung Dealer Agreement with Defendant Samsung Construction Equipment America Corporation ("SCEAC") at a time when SCEAC was an Illinois corporation with its principal place of business in Illinois.  Second, each had signed a Samsung Dealer Agreement which contained an Illinois choice of law *and* forum provision.  Although the Illinois choice of law provision was in the very same section of the Samsung Dealer Agreement as the forum selection clause, the plaintiffs invoked the Illinois choice of law provision while ignoring the Illinois forum selection language.

79.     Of the nine original plaintiffs in the Arkansas Samsung Dealers Litigation, only one—Capital Ford New Holland, Inc.—is located in Arkansas.  Three of the plaintiff Samsung dealers—Cromeens, Hollomon, Sibert, Inc., d/b/a Cisco Ford Equipment, Con-Equip., Inc., and Con-Equipment, Inc—are located in Texas.  One of the plaintiffs, FMS, Inc., is located in Maine.  Another—Performance Machinery Company—is located in Montana, and one—Keil Equipment Co., Inc.—is located in New York.  The remaining two plaintiffs—Hammer Equipment Sales, Ltd. And Korpan Tractor & Parts—are located in Canada:  in Calgary, Alberta and Saskatoon, Saskatchewan, respectively.  Ironically, the Arkansas plaintiff was the only one that had not been sent notice of termination of its Samsung Dealer Agreement.

80.     The Arkansas plaintiff has since been voluntarily dismissed from the Arkansas Samsung Dealers Litigation.  On September 29, 2000,  Volvo Construction removed the Arkansas Samsung Dealers Litigation to the United States District Court for the District of Arkansas, where it is currently pending as U.S.D.C. No. 4-00-CV-00715GH.    Volvo

Construction anticipates moving to transfer the Arkansas Samsung Dealers Litigation to federal court in Chicago for consolidation with the Illinois Samsung Dealers Litigation.

## (The Illinois Samsung Dealers Litigation)

81.    The "Illinois Samsung Dealers Litigation" was filed on June 14, 2000 as Civil Action No. OOC 3574 and is styled as *Volvo Construction Equipment North America, Inc. v. Cromeens, Hollomon, Sibert, Inc., d/b/a Cisco Ford Equipment, Con-Equip., Inc., Con-Equipment, Inc., FMS, Inc., Hammer Equipment Sales, Ltd., Keil Equipment Co., Inc., Korpan Tractor & Parts, and Performance Machinery Company.* In the Illinois Samsung Dealers Litigation, Volvo Construction seeks a declaratory judgment that:

a.    Volvo Construction has not breached any of the Samsung Dealer Agreements with the Defendants;

b.    The existence of the Samsung Dealer Agreement bars any ancillary tort claims that could be asserted by each Defendant;

c.    The Samsung Dealer Agreements are governed by Illinois law, as the parties have expressly agreed;

d.    The Samsung Dealer Agreements are not subject to the Illinois Franchise Disclosure Act of 1987;

e.    Even if the Samsung Dealer Agreements are otherwise subject to the Illinois Franchise Disclosure Act of 1987, they are exempt by virtue of the recently enacted exemption for construction equipment; and

f.    Even if the Samsung Dealer Agreements are subject to either the Illinois Franchise Disclosure Act of 1987 or the Illinois Equipment Fair Dealership Law, Volvo has not violated either statute.

82.     Rather than answer Volvo Construction's complaint in the Illinois Samsung Dealers Litigation, the defendant Samsung dealers have moved for dismissal, stay, or abstention on the grounds that the Arkansas Samsung Dealers Litigation was filed first. The dealers' motion is scheduled to be argued on October 30, 2000.

83.     In both the Arkansas Samsung Dealers Litigation and the Illinois Samsung Dealers Litigation, the Samsung dealers are represented by the Minneapolis law firm of Dady & Garner, P.A. According to its web site, a printout of which is attached as Exhibit S, "Dady & Garner, P.A., limits its practice to the representation of franchisees, distributors and dealers in disputes with their franchisors and suppliers." Each page of the Dady & Garner web site has drawings of saddles on either side of the firm name, consistent with the "cowboy" theme of the site. Indeed, under "Our Features," the web site has a reprint of a 1999 *Franchise Times* cover story entitled "The franchise standoff: the cowboy...." The cover features a photograph of Mr. Dady in cowboy attire. The story describes Mr. Dady's pursuit of buffalo in "South Dakota's annual Fall Buffalo Roundup, where 35 cowboys — Dady among them — push a herd of 1,500 buffalo through some of the roughest terrain in the state." In addition to describing the pursuit of buffalo, the story also describes the pursuit of franchisors and other suppliers in litigation on behalf of franchisees, distributors, and dealers. In the section of the firm web site entitled "Our Foes," *i.e.*, "franchisors, manufacturers and suppliers against whom the lawyers at Dady & Garner, P.A. have resolved disputes," Volvo Construction is listed. The listing of Volvo Construction as one of "Our Foes" is more than a reflection of the law firm's representation of the Samsung dealers in the Arkansas and Illinois Samsung Dealers Litigation. Rather, the law firm of Dady & Garner is also representing a number of the CHAMPION Trademark Licensees and Other Potential Defendants in their disputes arising under the Champion Dealer Agreements.

84.    The existence of these disputes — some of which are already the subject of current or impending litigation — along with the experience of Volvo Construction in the Arkansas and Illinois Samsung Dealers Litigation are among the reasons that Volvo Construction and Champion Road face a multiplicity of actions as they proceed with termination of the Champion Dealer Agreements and with "Volvoization" of the motor graders currently sold under the CHAMPION Trademarks.

**(Volvo Construction's Termination of the Champion Dealer Agreements
and Plans to Rebrand CHAMPION Motor Graders Under the VOLVO Marks)**

85.    Pursuant to the Agency Agreement between Champion Road and Volvo Construction, Volvo Construction has sent notices of termination of the Champion Dealer Agreements to the CHAMPION Trademark Licensees and Other Potential Defendants, as follows:

| Name of Dealer | Date of Termination Notice | Effective Date of Termination |
| --- | --- | --- |
| Abele Tractor & Equipment Co. | November 16, 1999 | January 16, 2000 |
| AIS Construction Equipment Corp. | August 9, 2000 | November 9, 2000 |
| Beauregard Equipment Co. | December 16, 1999 | February 16, 2000 |
| Burch-Lowe, Inc. | July 30, 1999 | August 27, 1999 |
| N.A. Burkitt, Inc. | November 15, 1999 | January 15, 2000 |
| United Rentals, Inc. f/k/a Century Equipment Company | December 7, 2000 | February 7, 2000 |
| Clark Machinery Company | October 10, 2000 | January 9, 2001 |
| CLM Equipment Company, Inc. | October 10, 2000 | January 9, 2001 |
| Cooper Equipment Company | January 19, 2000 | March 19, 2000 |

| | | |
|---|---|---|
| Crawler Supply Co. Inc. | October 10, 2000 | January 9, 2001 |
| Future Equipment Company, Inc. | January 19, 2000 | March 19, 2000 |
| J.D Evans, Inc. | September 20, 1999 | June 15, 2000 |
| The McLean Company | October 10, 2000 | December 10, 2000 |
| Mid South Machinery, Inc. | June 21, 2000 | August 21, 2000 |
| Miller-Bradford & Risberg, Inc. | August 10, 2000 | November 10, 2000 |
| Mitchell Distributing Company | March 15, 2000 | March 31, 2000 |
| Monroe Tractor and Implement Co. Inc. | April 7, 1999 | June 7, 1999 |
| Joe Money Machinery Company, Inc. | June 23, 1999 | August 27, 1999 |
| O.C.T. Equipment, Inc. | July, 14, 1999 | September 14, 1999 |
| Neuces Farm Center, Inc. d/b/a Neuces Power Equipment | January 25, 2000 | June 25, 2000 |
| Querel Equipment Sales and Supply Ltd. | N/A | N/A |
| Ralph C. Herman Co, Inc. | November 16, 1999 | January 16, 2000 |
| RB Everett & Company | January 20, 2000 | March 20, 2000 |
| St. Joseph Equipment, Inc.- Industrial Division | October 10, 2000 | January 9, 2001 |
| Tracey Road Equipment, Inc. | January 10, 2000 | February 17, 2000 |
| Trius, Inc. | December 9, 1999 | February 9, 2000 |
| Tucson Tractor Company | December 8, 1999 | February 8, 2000 |
| Western Power & Equipment Co. | October 6, 2000 | December 31, 2000 |
| West Virginia Tractor Company | June 28, 2000 | January 28, 2001 |

86.    Ever since the acquisition of Champion Road by the Volvo Construction Equipment Group, the CHAMPION Trademark Licensees and Other Potential Defendants have anticipated the "Volvoization" and dealer consolidation process that is now underway.    In anticipation of this process, these dealers have sought to become licensed to use the VOLVO Marks pursuant to dealer agreements with Volvo Construction.    For example, following the Champion Road acquisition, Defendant NPE sent correspondence (copies of which are attached as Exhibits T and U) to both Volvo Construction and Champion Road expressing NPE's interest in being appointed as a dealer for Volvo and Samsung construction equipment.    The foregoing correspondence reflected NPE's concern that, only by becoming a Volvo Construction dealer could it be supplied with the motor graders that NPE, the other CHAMPION Trademark Licensees, and the Other Potential Defendants all anticipated would eventually be rebranded under the VOLVO Marks.

87.    The anticipated rebranding is now imminent.    Effective January 1, 2001, Champion Road will no longer manufacture motor graders under the CHAMPION Trademark. Effective January 1, 2001, Champion Road will manufacture motor graders under the VOLVO Marks for supply to Volvo Construction and the other members of the Volvo Construction Equipment Group.

88.    Volvo Construction's prior experience with consolidation of the Samsung dealer network — including the Connecticut Samsung Dealer Litigation, the Arkansas Samsung Dealers Litigation, and the Illinois Samsung Dealers Litigation — and the conduct and statements of the CHAMPION Trademark Licensees and their counsel have provided Volvo Construction and

Champion Road with a reasonable apprehension of litigation as a result of the impending rebranding of motor graders under the VOLVO Marks. Without a declaratory judgment, Volvo Construction and Champion Road are likely to face a multiplicity of actions.

### (The Multiplicity of Actions That this Declaratory Judgement Action Will Help the Volvo Plaintiffs Avoid)

89.    Already, Volvo Construction's termination of certain Champion Dealer Agreements has resulted in two pieces of litigation *of which Volvo Construction and Champion Road are aware*:

a.    the case of *N.A. Burkitt, Inc. v. Champion Road Machinery International Corp. and Volvo Construction Equipment North America, Inc.*, which was filed on February 2, 2000 as Civil Action NO. 00-36-P-H in the United States District Court of Maine (the "Maine Litigation"); and

b.    the case of *Nueces Farm Center, Inc. d/b/a Nueces Power Equipment v. Volvo Construction Equipment North America, Inc., Champion Road Machinery Limited, and Romco, Inc. d/b/a Romco Equipment Co.*, which was filed on August 28, 2000 as Trial Court Cause No. 00-4732-E in Corpus Christi, Texas in the District Court of Nueces County, Texas, 148th Judicial District (the "South Texas Litigation").

90.    In the Maine Litigation, the plaintiff filed suit in Portland, Maine and alleged that its termination as a Champion Dealer violated the Maine Motor Vehicle Dealers Act. A copy of the complaint and related pleadings by which the plaintiff in the Maine Litigation sought temporary and preliminary injunctive relief is attached as Exhibit V. In the Maine Litigation, the federal court denied the plaintiff's motion for temporary restraining order by way of the February 16, 2000 Order attached as Exhibit W. The federal court in the Maine Litigation found that the

plaintiff was unlikely to succeed on the merits because motor graders are not "motor vehicles" within the meaning of the Maine Motor Vehicle Dealers Act. That issue of state law was certified to the Supreme Judicial Court for the State of Maine and oral argument was held on October 3, 2000.

91. In the South Texas Litigation, the plaintiff is NPE — one of the CHAMPION Trademark Licensees named as a Defendant in this Complaint for Declaratory Judgment. NPE initiated the South Texas Litigation in Corpus Christi notwithstanding the fact that its Champion Dealer Agreement contained the Canadian Forum Selection Provision. On the basis of the Canadian Forum Selection Provision, Champion Road sought to have the Nueces County District Court dismiss the South Texas Litigation. Copies of Champion's Motion to Dismiss for Lack of Subject Matter Jurisdiction and the Memorandum in Support thereof are attached as Exhibit X. Notwithstanding the Canadian Forum Selection Provision, the Nueces County District Court summarily denied Champion Road's motion to dismiss by way of the Order attached as Exhibit Y.

92. Regardless of whether Champion Road seeks relief — by mandamus, appeal, or otherwise — from the Nueces County District Court's refusal to enforce the Canadian Forum Selection Provision, it is clear that the South Texas Litigation will not even resolve the entire dispute involving NPE, Volvo Construction, and Champion Road — much less the disputes that Volvo Construction and Champion Road have with the other CHAMPION Trademark Licensees. In fact, the impending rebranding under the VOLVO Marks of motor graders currently sold under the CHAMPION Trademark is — according to NPE's president, NPE's counsel, and the presiding judge — outside the scope of the South Texas Litigation. Cross-examination of NPE's president at a September 7, 2000 hearing resulted in the following exchange on the record:

Q.     …. Isn't what you're really worried about is that – the possibility that Volvo will stop selling motor graders that say "Champion" on them and instead will sell motor graders that say "Volvo" on them?

A.     It's a concern, yes, sir.

Q.     And that's one of the reasons that you wanted to become a Volvo dealer; isn't that right?

A.     That's correct.

Q.     And you've never sold or never been a dealer for Volvo brand construction equipment; isn't that right?

A.     That's correct.

Q.     And you're not asking the Court by way of this TRO – your understanding is not that it would make you a Volvo dealer; isn't that right?

A.     That's correct.

Q.     And so if Vol[v]o were to stop selling motor graders that say "Champion" on them and start selling graders that say "Volvo" on them, it wouldn't be your contention that Volvo has to sell you the Volvo motor graders; isn't that right?

MR. DADY:  Objection.  We're going around this barn a second time.  The question was asked ten minutes ago.  I objected. It calls for speculation.  It's outside the scope of the direction in this case.  I renew the objection and ask for the same ruling.

MR. LOCKERBY:  Judge, this witness seems to be saying that the contract says things that it doesn't say and doesn't say things that it does say, and we have some concern about the scope of the TRO, since he seems to have a different understanding than what these documents claim to say, and I think we need to get some clarification and what he is seeking.

MR. DADY:  *If Volvo thinks they can take the "Champion" decal off and put the "Volvo" decal on and stiff or terminate all of my clients, including Mr. Bradshaw, that's a fight for another day.*  They haven't done that yet.  They haven't announced they're doing that.  *And it's not an issue that's present in this litigation.  That's not a termination of a product line when*

*you change a decal. It's outside the scope of this litigation so we object to this line of questioning.*

**THE COURT: The objection is sustained.**

(Transcript p. 153 l. 8 - p. 155 l. 4) (emphasis supplied).

93.     Whatever the outcome of the South Texas Litigation, it will not resolve the deprivation of Volvo Trademark's and Volvo Construction's Lanham Act rights that would result if Volvo Construction and Champion Road were forced to license the VOLVO Marks to NPE and supply NPE with motor graders under the VOLVO Marks. *To the contrary, that issue is — in the words of NPE's counsel, Dady & Garner — "outside the scope of this litigation" in Corpus Christi, and the judge presiding over the South Texas Litigation has agreed.* Moreover, the South Texas Litigation will not and cannot resolve the Lanham Act and contractual issues that are the subject of this Complaint with respect to the other CHAMPION Trademark Licensees and the Other Potential Defendants who are not parties to the South Texas Litigation. In addition, the events leading up to the filing of the South Texas Litigation also suggest that — without the declaratory judgment that they seek — Volvo Construction and Champion Road face a multiplicity of actions, in multiple forums, against the CHAMPION Trademark Licensees and Other Potential Defendants.

94.     NPE commenced the South Texas Litigation on August 28, 2000 by seeking and obtaining an *ex parte* TRO against the termination of its Champion Dealer Agreement. In support of its request for *ex parte* relief, NPE represented to the Court that "[i]t is *essential that the Court act immediately*, prior to notice ... and a hearing." Original Petition for Specific Performance, Damages, Declaratory Judgment, Temporary Injunction, Permanent Injunction and Application for Temporary Restraining Order at p. 35, ¶ 124, copy attached as Exhibit Z (emphasis supplied). NPE represented to the Court that "[i]t is essential that the Court act

immediately" even though NPE had known for *nearly nine months* of the impending termination

of its Champion Dealer Agreement. On December 3, 1999, according to a December 22, 1999

letter from NPE (copy attached as Exhibit AA), Volvo Construction had informed NPE that

Romco—the pre-existing Volvo Construction dealer in South Texas—"would also take over

Nueces Power Equipment's territory." NPE failed to seek injunctive relief in either December

1999 or January 2000 even though NPE received formal notice—both in person and in writing—

in January 2000 that its Champion Dealer Agreement was being terminated. A copy of the

January 25, 2000 notice of termination is attached as Exhibit BB.

95.    Within twenty-hours of receipt of the January 25, 2000 notice of termination, NPE

replied by way of correspondence on which the apparent author(s), one or both of two attorneys

at the law firm of Dady & Garner, were shown as "cc" recipients. These letters included (a)

January 26, 2000 correspondence from NPE to Volvo Construction Equipment, N.V. protesting

the notice of termination, a copy of which is attached as Exhibit CC ("NPE's Attempt to

Implicate Volvo Construction's Affiliate") and (b) January 26, 2000 correspondence from NPE

to Romco, Inc. entitled "Notice of Contractual Rights," a copy of which is attached as Exhibit

DD ("NPE's Attempt to Implicate Volvo Construction's Independent Dealer").

96.    NPE's Attempt to Implicate Volvo Construction's Affiliate stated in pertinent

part:

> We at Nueces Farm Center, Inc. ("Nueces") have reviewed the recent turn of
> events regarding our Champion motor grader/paver dealership. These events
> concern Champion/Volvo's desire to terminate our franchise rights. We are
> writing to inform you that we believe that your recent conduct, including your
> plan of setting up Romco as the dealer of Champion products in our trade area, an
> area which has clearly been Nueces' trade area for over ten years, is in clear
> violation of the applicable statutes and a breach of the contract between the
> parties.

Needless to say, we are shocked and disappointed that Champion/Volvo would treat us this way. We believe that some background regarding Nueces's relationship with Champion/Volvo may prove useful to you as you, hopefully, reconsider Champion/Volvo's decision to terminate our rights.

Nueces has been a dealer of Champion/Volvo products since 1989. When we first signed our dealership agreement, and on several occasions thereafter, it was made clear by Champion/Volvo that, so long as we adequately performed as a Champion/Volvo dealer, we would be able to continue as the only Champion/Volvo dealer in our area. Champion/Volvo also told us that if, at any time, it was perceived that we were not adequately performing as an Champion/Volvo dealer, we would be notified by Champion/Volvo of any such perceived deficiency and given a reasonable opportunity to correct it.

More specifically, in 1989, when we were approached by Champion representative, Rick Chapman, Champion desperately wanted us as a dealer. At that time, we were told by Mr. Chapman that we could continue as a Champion dealer so long as we adequately performed. Thereafter, when Volvo acquired Champion, we were told by Champion/Volvo through written correspondence, that we would not be terminated as a dealer based on Champion/Volvo's desire to consolidate its product lines. (In fact, we were told just the opposite, with Volvo telling us we could not have the Volvo line because it was held by Romco, and Volvo did not want to consolidate in Texas.)

Over the years, in their visits to our dealership, Mr. Chapman and his successors continually commended us on our excellent performance in representing Champion/Volvo in the marketplace. We were never told that our performance was jeopardizing our future as a dealer for Champion/Volvo. Indeed, we are aware that we have achieved significantly higher market share than Champion has ever achieved on a national level! Our performance has always been commended, and we were looking forward to working with Champion/Volvo to further increase our market penetration and dominance.

Since 1989, we have helped expand Champion/Volvo product sales in our market area. Specifically, we have nurtured and developed the Champion/Volvo product line in our trade area. Sales have grown steadily and in the past year Nueces sold 24 units of Champion/Volvo product, and achieved close to 50% marketshare. As you are probably aware, we have expended a significant amount of time, effort and money in promoting Champion/Volvo products in our trade area. There can be no serious question about the job we have done in promoting and selling the Champion/Volvo product in our trade area.

Notwithstanding the foregoing, imagine our surprise when, on January 20, 2000, you advised us of the decision regarding the termination of our rights. We were hopeful, after Mr. Beckmann advised us he believed Volvo had made a "big mistake," and returned to Asheville without giving us the notice of termination he

had come to deliver on January 20, 2000, that Volvo would recognize the unlawfulness, inequity, and foolishness of the decision to terminate us. In our conversation with Mr. Beckmann, it was quite clear that we had done nothing wrong and that Champion/Volvo was not questioning our overall performance.

Apparently, as was made clear in the letter that we received on January 25, 2000, and despite acknowledging the fact that this is a mistake, Volvo has decided to go forward with a termination that is not in anyone's best interest, and not due to any performance deficiencies on our part. Indeed, it is clear that we are being terminated in order to allow Champion/Volvo to give the dealership to Romco, thereby consolidated Volvo's lines into a single dealership in Texas. This decision is inconsistent with our contract with Champion/Volvo, and our rights as a dealer under state law. Further, we were never given any notice of deficiency, or an opportunity to cure any such deficiency prior to receiving the notice of termination. This is also a breach of our contractual rights, as well as being a violation of several applicable state statutes.

As you know, we desire to keep the Champion/Volvo line and believe it is unfair for you to terminate us based upon something besides our overall performance.

It is clear to us that Champion/Volvo agrees that our performance has not been deficient. Indeed, we have never been treated in a manner inconsistent with Champion/Volvo's policy of allowing a dealer to continue so long as the dealer was performing. To the contrary, both Nueces and Champion/Volvo have conducted themselves, over the course of the last ten years, in a manner that can leave no doubt about our rights. If you have any legitimate concerns about the way we have handled the accounts in our trade area, tell us what those concerns are and work with us to develop a plan to address them. We would particularly welcome receiving information from you about how our substantial efforts to meet and comply with all requests of Champion/Volvo over the last several years compares with the efforts of other similarly situated Champion/Volvo dealers.

In short, we are asking that you reconsider your decision and allow us to continue as a Champion/Volvo dealer. We would also request that you provide us with the products and support we need and deserve in order to have a reasonable chance to succeed. We do not want to be terminated, and want to work with Champion/Volvo to promote the Champion/Volvo line. We remain willing to meet with you to reasonably address any legitimate concerns you may have. (Given the threat to our business caused by your notice of termination, we request that either or both of our attorneys, Michael Dady and Ron Gardner, be allowed to attend this meeting as well.)

Given the seriousness of this matter, we hope you will respond within the next few days. We look forward to hearing from you shortly.

Exhibit CC (emphasis in original).

97.    The wording of NPE's Attempt to Implicate Volvo Construction's Affiliate was virtually identical to that of other letters that Volvo Construction has since received from one or more of the Other Potential Defendants. For example, on February 14, 2000, Volvo Construction received from J.D. Evans, Inc. the correspondence attached as Exhibit EE. This February 14, 2000 correspondence stated:

> We at J.D. Evans, Inc. have reviewed the recent turn of events regarding our Volvo/Champion dealership. These events concern Volvo/Champion's desire to terminate our franchise rights, first through an attempt to directly terminate us, and more recently, through a "dual distribution" strategy. We are writing to inform you that we believe that your recent conduct is in clear violation of the applicable statutes and a breach of the contract between the parties.

> Needless to say, we are shocked and disappointed that Volvo/Champion would treat us this way. We believe that some background regarding J.D. Evans's relationship with Volvo/Champion may prove useful to you as you, hopefully, reconsider Volvo/Champion's decision to terminate us, either directly, or through a dual distribution arrangement.

> J.D. Evans has been a dealer of Volvo/Champion products since 1971, when Champion products were manufactured and distributed under the brand name "Cleveland Equipment." When we first signed our dealership agreement, and on several occasions thereafter, it was made clear by Champion that, so long as we adequately performed as a Champion dealer, we would be able to continue as the only Champion dealer in our area! Champion also told us that if, at any time, it was perceived that we were not adequately performing as an Volvo/Champion dealer, we would be notified by Volvo/Champion of any such perceived deficiency and given a reasonable opportunity to correct it.

> Since that time, we have never been told that our performance was jeopardizing our future as a dealer for Volvo/Champion. Further, there has never been any modification of our right to continue as the only dealer of Champion products in our trade area. Indeed, we draw your attention to Paragraph 11 of our December 23, 1985 dealer agreement, which, in relevant part, provides as follows:

>> *CHAMPION may sell, lease loan, or give products or parts or provide service within the APR, directly or indirectly, and at any time, to (a) the federal government and all political subdivisions, agencies, authorities, and instrumentalities thereof; (b) "national accounts", as that term is hereinafter defined; and (c) such other*

> *persons as to which the DISTRIBUTOR and CHAMPION may mutually agree from time to time…*

As you can see, Volvo's current strategy of attempting to effectuate a consolidation of products into the Volvo dealer's offerings, through the purported "dual distribution" strategy, without our express agreement, is clearly in violation of J.D. Evans contractual rights (and, we are told by our lawyers, may also violate South Dakota law).

Since 1971, we have helped expand Champion product sales in our market area. Specifically, we have nurtured and developed the Champion product line in our trade area. When we began selling Champion products in South Dakota, the product line was a complete unknown with no market acceptance. Sales grew steadily over the years, and as recently as 1997, we were recognized as one of Champion's Top Ten Dealers in North America. As you are probably aware, we have expended a significant amount of time, effort and money in promoting Champion products in our trade area. There can be no serious question about the job we have done in promoting and selling the Volvo/Champion product in our trade area.

Notwithstanding the foregoing, imagine our surprise when you advised us of the decision regarding the termination of our rights. It was quite clear from your communication that we had done nothing wrong and that Volvo/Champion was not questioning our overall performance. Rather, we believe we are being terminated in order to allow Volvo/Champion to give the dealership to Sheehan Volvo, thereby consolidated Volvo's lines into a single dealership in the Sioux Falls, South Dakota APR. This decision is inconsistent with our contract with Volvo/Champion and our rights as a dealer under state law. Further, we were never given any notice of deficiency, or an opportunity to cure any such deficiency prior to receiving the notice of termination. This is clearly a breach of our contractual rights, as well as being a violation of several applicable state statutes.

As you know, we desire to keep the Champion line and believe it is unfair for you to terminate us based upon something besides our overall performance.

It is clear to us that Champion agrees that our performance has not been deficient. Indeed, we have never been treated in a manner inconsistent with Volvo/Champion's policy of allowing a dealer to continue so long as the dealer was performing. To the contrary, both J.D. Evans and Volvo/Champion have conducted themselves, over the course of the last 29 years, in a manner that can leave no doubt about out rights. If you have any legitimate concerns about the way we have handled our accounts in our trade area, tell us what those concerns are and work with us to develop a plan to address them. We would particularly welcome receiving information from you about how our substantial efforts to meet and comply with all requests of Volvo/Champion over the last several years compares with the efforts of other similarly situated Volvo/Champion dealers.

In short, we are asking that you reconsider your decision and allow us to continue as the only Volvo/Champion dealer in our APR. We would also request that you provide us with the products and support we need and deserve in order to have a reasonable chance to succeed. We do not want to be terminated, either directly, or at the hands of a "dual distribution" policy, and want to work with Volvo/Champion to promote the Volvo/Champion line. We remain willing to meet with you to reasonably address any legitimate concerns you may have. (Given the threat to our business caused by your actions, we request that either or both of our attorneys, Michael Dady and Ron Gardner, be allowed to attend this meeting as well.)

Given the seriousness of this matter, we hope you will respond within the next few days. We look forward to hearing from you shortly.

Exhibit EE (emphasis in original).

98. NPE's Attempt to Implicate Volvo Construction's Independent Dealer stated in

pertinent part:

As a long-time dealer of Volvo products, I [sic] suspect that you are already aware of our right to act as the exclusive dealer of the Champion products we carry in the South Texas AOR. However, because of recent events that have come to our attention, we are writing to provide you with formal notice of those rights.

Please be advised that Nueces Power Equipment Inc. has been given the right to remain as the only dealer of Champion products in our AOR so long as we adequately perform, and in the event we have not adequately performed, Champion has always committed to us that we would be given notice of any deficiency in our performance and an opportunity to cure. Those rights were initially acquired by us as far back as 1989. Currently, we continue as an Champion dealer, and we believe that we will continue to do so for the foreseeable future. Accordingly, we are calling upon you to not take any action that would interfere with our contractual rights, such as entering into any franchise or dealership agreement with Champion or Volvo that would violate our exclusive rights.

We would expect that Champion/Volvo would acknowledge the nature and extent of our exclusive rights in this regard. In the event that it does not, we suggest that you might want to consider asking Champion/Volvo to agree to defend and indemnify you against any claims we may make based on our rights. Both you and Champion/Volvo, if you proceed with the acquisition of a dealership in our AOR, will be acting in intentional derogation of those rights. Thank you.

Exhibit DD.

99.    The wording of NPE's Attempt to Implicate Volvo Construction's Independent

Dealer was virtually identical to that of other letters that other independent dealers of Volvo

Construction have since received from one or more of the other CHAMPION Trademark

Licensees and Other Potential Defendants. For example, on February 14, 2000, one of the Other

Potential Defendants, J.D. Evans, Inc. in Sioux Falls, South Dakota, sent a "Notice of

Contractual Rights" to a Volvo Construction dealer, Sheehan Mack Sales & Equipment. This

February 14, 2000 correspondence, a copy of which is attached as Exhibit FF, stated as follows:

> As a long-time dealer of Volvo products, I [sic] suspect that you are already aware
> of our right to act as the exclusive dealer of the Champion products we carry in
> the South Dakota APR. However, because of recent events that have come to our
> attention, we are writing to provide you with formal notice of those rights.
>
> Please be advised that J.D. Evans, Inc has been given the right to remain as the
> only dealer of Champion products in our APR so long as we adequately perform,
> and in the event we have not adequately performed, Champion has always
> committed to us that we would be given notice of any deficiency in our
> performance and an opportunity to cure. Those rights were initially acquired by
> us as far back as 1971. Currently, we continue as an Champion dealer, and we
> belief that we will continue to do so for the foreseeable future. Accordingly, we
> are calling upon you to not take any action that would interfere with our
> contractual rights, such as entering into any franchise or dealership agreement
> with Champion or Volvo that would violate our exclusive rights.
>
> We would expect that Champion/Volvo would acknowledge the nature and extent
> of our exclusive rights in this regard. In the event that it does not, we suggest that
> you might want to consider asking Champion/Volvo to agree to defend and
> indemnity you against any claims we may make based on our rights. Both you
> and Champion/Volvo, if you proceed with the acquisition of a dealership in our
> APR, will be acting in intentional derogation of those rights. Thank you.

Exhibit FF (emphasis in original).

100.    In response to NPE's Attempt to Implicate Volvo Construction's Affiliate and

Volvo Construction's Attempt to Implicate Volvo Construction's Independent Dealer, Volvo

Construction sent the February 10, 2000 correspondence attached as Exhibit GG. This

correspondence confirmed that Volvo Construction "remains committed to the decision to

terminate the distribution relationship between Nueces Power Equipment and Volvo [Construction] and will continue to act accordingly." *Id.*

101.    At no time in January or February 2000 did NPE seek to enjoin the impending termination of its Champion Dealer Agreement.    On March 1, 2000, by way of the correspondence attached as Exhibit HH, Volvo Construction extended the effective date of the termination until June 23, 2000.    In extending the effective date of the termination, Volvo Construction made clear that it was ***not*** reconsidering or rescinding the notice of termination.    To the contrary, Volvo Construction stated ***in writing*** that the sole purpose of the extension was to allow additional time for "the structuring of the terms and conditions of this termination." Exhibit HH.

102.    At no time in March, April, May, or June 2000 did NPE seek to enjoin the impending termination of its Champion Dealer Agreement.    On June 6, 2000, by way of the correspondence attached as Exhibit II, Volvo Construction notified NPE that the termination would become effective September 1, 2000, and that no further extensions of the deadline would be granted.    In extending the effective date of the termination, Volvo Construction made clear that it was ***not*** reconsidering or rescinding the notice of termination.    To the contrary, Volvo Construction stated ***in writing*** that the sole purpose of the extension was to allow additional time for "the structuring of the terms and conditions of this termination." Exhibit II.

103.    In short, although NPE had received written notice back in January that its Champion Dealer Agreement was being terminated — and had been reminded repeatedly in writing that the notice of termination was ***not*** being reconsidered or rescinded and that the sole purpose of the extension was to allow additional time for "the structuring of the terms and

conditions of this termination" — NPE waited *more than eight months*, until August 28, 2000, before seeking to enjoin Volvo Construction's termination of the Champion Dealer Agreement.

104. On August 28, 2000, NPE obtained an *ex parte* TRO preventing Volvo Construction from terminating the Champion Dealer Agreement and further preventing Volvo Construction from granting to Romco the ability to sell motor grades under the CHAMPION Trademarks in NPE's trade area.

105. Following hearings on September 7, 19 and 20, 2000, the Nueces County Court set trial for December 4, 2000 and extended the *ex parte* TRO through the date of trial. The scope of the TRO and of the trial are limited to NPE's challenge to the termination of its Champion Dealer Agreement. According to NPE's counsel, Dady & Garner, and the presiding judge in the Nueces County Court, any rebranding under the VOLVO Marks of motor graders formerly sold under the CHAMPION Trademark is outside the scope of the South Texas Litigation. However, the statements of NPE's counsel on the record (*see, e.g.*, ¶ 92: "that's a fight for another day") give Volvo Construction and/or Champion Road a reasonable apprehension of being sued by NPE, the other CHAMPION Trademark Licensees, and at least some of the Other Potential Defendants — many of which are represented by Dady & Garner — upon formal announcement of the decision to rebrand CHAMPION motor grades under the VOLVO Marks.

106. The Other CHAMPION Trademark Licensees whose conduct and statements have given Volvo Construction and Champion Road a reasonable apprehension of being sued include Defendant AIS, which is also represented by Dady & Garner.

107. Volvo Construction sent AIS written notice on August 9, 2000 that its Champion Dealer Agreement would be terminated effective November 9, 2000. In addition, Volvo

Construction stated a desire to work with AIS in identifying and resolving issues related to the termination.

108.    On August 11, 2000, AIS (through legal counsel) responded that Volvo Construction's attempt to terminate was unlawful under Michigan law. AIS's counsel threatened that "[s]uch termination would . . . subject Volvo to a serious and expensive lawsuit for damages[]" and also asserted that "[i]n view of the substantial investment that AIS has made in developing the market for Champion machinery and parts, AIS will take whatever action is necessary to vindicate its rights." A copy of AIS's letter is attached hereto as Exhibit JJ.

109.    Following subsequent, unsuccessful efforts to negotiate a mutually agreeable termination of AIS' Champion Dealer Agreement, AIS retained Dady & Garner. Although the efforts to resolve the parties' dispute continue, AIS continues to threaten litigation. For example, on October 5, 2000, AIS sent Volvo Construction some financial information that Volvo Construction had been requesting for some time for purposes of attempting to value AIS' distribution rights under the Champion Dealer Agreement. The very first paragraph of AIS' letter, on which Mr. Dady at Dady & Garner was shown as a "cc" recipient, called for a response by October 11, 2000 and stated: "Realize that we will file an injunction preventing this wrongful termination by early the following week if we cannot reach a reasonable settlement for our (33) years of building this business."

110.    Unlike the other CHAMPION Trademark Licensees, Defendant CLM was not previously sent notice of termination of its Champion Dealer Agreement. However, Volvo Construction has discussed with CLM the prospect that its Champion Dealer Agreement will be terminated. During the course of such discussions, CLM has stated that termination of its Champion Dealer Agreement and/or termination of the sale of motor graders under the

CHAMPION Trademark would result in litigation. In threatening litigation, CLM stated that Louisiana law was "pro-dealer." The logical implication of this statement is that (a) CLM intends to file suit in Louisiana and (b) CLM will seek to avoid the application of the South Carolina Choice of Law Provision of its Champion Dealer Agreement.

111. Like Defendants AIS and NPE, FEC previously received notice of termination from Volvo Construction. On January 19, 2000, Volvo Construction sent Defendant FEC written notice that its Champion Dealer Agreement would be terminated effective March 19, 2000.

112. In response to the notice of termination, FEC responded with the February 8, 2000 correspondence from its counsel attached as Exhibit KK. FEC's response stated that Volvo Construction's "termination of the Agreement is clearly in violation of Texas law." Exhibit KK. Like AIS, FEC threatened that, unless Volvo Construction withdrew its termination notice, FEC would "file suit against [Volvo Construction] and seek all remedies available under law, including without limitation, injunctive relief, actual and exemplary damages and attorney's fees." *Id.*

113. On February 8, 2000, FEC's counsel sent the correspondence attached as Exhibit LL ("FEC's Attempt to Implicate Volvo Construction's Independent Dealer"). Like NPE's Attempt to Implicate Volvo Construction's Independent Dealer, FEC's Attempt to Implicate Volvo Construction's Independent Dealer was addressed to Romco. Romco is the pre-existing Volvo Construction dealer licensed to distribute construction equipment under the VOLVO Marks in much of the State of Texas, including the areas served by Defendants FEC and NPE. FEC's Attempt to Implicate Volvo Construction's Independent Dealer stated as follows:

> We represent Future Equipment, Inc. ("FEI"), a party to that certain Dealer Agreement (the "Agreement"), dated July 15, 1996, by and between FEI and Champion Road Machinery Limited ("Champion"). By letter dated January 19,

2000, Volvo Construction Equipment North America, Inc. ("Volvo") advised that it assumed Champion's interest under the Agreement.

It is our understanding that you have tortuously [sic] interfered with our client's rights under the Agreement with Volvo and with our client's business relationship with Volvo and that you have conspired with Volvo to terminate the Agreement. Unless you cease and desist from any further tortuous [sic] interference with either our client's Agreement with Volvo and/or our client's business relationship with Volvo, we will be forced to take the appropriate legal actions.

As you may know, Texas juries have consistently awarded substantial damages against parties who tortuously [sic] interfere with another's contract or business relations. Consider, by way of example, the highly publicized case involving Pennzoil and Texaco in which a Texas jury awarded Pennzoil billions of dollars in actual and punitive damages for tortuously [sic] interfering with a contract. While our client's claims against you may not reach into the billions, we assure you that they are substantial.

We strongly urge you to cease and desist from further tortuously [sic] interfering with our client's rights under the Agreement or with its business relations or otherwise conspiring to usurp FEI's rights as a Champion dealer. Should you fail to do so, we have been instructed to file suit against you and seek all remedies available under law, including injunctive relief and actual and exemplary damages. Please understand that while our client would prefer to go about its business without resort to litigation, it is prepared to do so if necessary to protect its interests.

We trust you will give this serious matter your immediate attention.

Exhibit LL.

114. Each of the CHAMPION Trademark Licensees has refused to acknowledge that the Claim Barring Provisions of its Champion Dealer Agreement permit termination of the contract and/or discontinuation of the manufacture and sale of motor graders under the CHAMPION Trademark without liability in contract or tort on the part of Champion Road and its agent Volvo Construction. Instead, each of the CHAMPION Trademark Licensees has given Champion Road and Volvo Construction reasonable apprehension of litigation in which the allegations will include claims that termination of the Champion Dealer Agreement breaches the contract and the implied duty of good faith and fair dealing, violates the law of the state in which

the CHAMPION Trademark Licensee does business, and is tortious. In the case of NPE, the threat of such litigation is already a reality.

115. Each of the CHAMPION Trademark Licensees has given Volvo Construction and/or Champion Road a reasonable apprehension that the rebranding under the VOLVO Marks of motor graders currently sold under the CHAMPION Trademark will result in additional litigation. In the words of Dady & Garner, counsel for Defendant NPE in the South Texas Litigation:

> If Volvo [Construction] thinks they can take the "Champion" decal off and put the "Volvo" decal on and stiff or terminate all of my clients, including Mr. Bradshaw [principal of NPE], *that's a fight for another day*.

*See* ¶ 92 *infra* (emphasis supplied). The day for the "fight" that the CHAMPION Trademark Licensees and its counsel seem intent on having with "[o]ur [f]oes" (*see* Exhibit R) Volvo Construction and Champion Road is *today*, with the filing of this action seeking, *inter alia*, a declaration of the rights of Volvo Trademark, Volvo Construction, and Champion Road under the federal trademark statute, the Lanham Act.

116. The declaratory judgment sought by Volvo Trademark, Volvo Construction, and Champion Road will help further the purposes of the Lanham Act. Sections 32(1) and 43(a) of the Lanham Act have as their primary purpose preventing likelihood of confusion among consumers. *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 484 (9th Cir. 1994) ("The purpose of the Lanham Trademark Act, Pub.L. 87-772, 15 U.S.C. §§ 1051-1127 (the 'Lanham Act'), is to prevent consumer confusion or deception about the origin or make of a product."), *cert. denied*, 514 U.S. 1021 (1995). The trademark dilution provisions of Section 43(c) of the Lanham Act were enacted to prevent blurring and tarnishment of famous marks. *See, e.g., Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 214 (2d Cir. 1999) (intent of federal

dilution law is to prevent the gradual diminution or whittling away of the value of a famous mark by blurring uses by others); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 670 n.12 (5th Cir. 2000) ("There are two recognized forms of dilution: blurring and tarnishment.").

117.     In this case, the declaratory judgment sought by Volvo Trademark, Volvo Construction, and Champion Road will help prevent *both* likelihood of confusion with *and* dilution (*i.e.*, blurring and/or tarnishment) of the VOLVO Marks.     At least some of this confusion, blurring, and tarnishment is likely to result from the fact that — as part of their efforts to secure a license to use the VOLVO Marks — dealers of construction equipment manufacturers acquired by Volvo Construction have been using the VOLVO Marks in conjunction with the trademark(s) of their original supplier.     For example, the Complaint filed in the Connecticut Samsung Dealer Litigation contains repeated references to a company—and a trademark—that do not exist: "Samsung/Volvo."     *See, e.g.*, Exhibit Q ¶ 16 ("Samsung/Volvo dealer"), ¶ 18 ("Samsung/Volvo products"), ¶¶ 31 and 33 ("Samsung/Volvo dealership"), ¶ 32 (two references to "the Samsung/Volvo franchise").     The Complaint filed in the Arkansas Samsung Dealers Litigation similarly contains repeated references to "Volvo/Samsung."     *See, e.g.*, Exhibit R ¶¶ 1, 2 ("Volvo/Samsung's conduct" and Volvo/Samsung's scheme), ¶ 35b. ("Samsung/Volvo Representative" and "Volvo/Samsung dealer"), ¶ 36 ("Sansung/Volvo line"), ¶ 50 ("Samsung/Volvo" and "Samsung/Volvo dealers"), ¶ 75c. ("Volvo/Samsung products").

118.     Both in litigation and in correspondence threatening litigation, the CHAMPION Trademark Licensees and Other Potential Defendants have used the CHAMPION Trademark in conjunction with the VOLVO Marks even though the trademarks do not appear in conjunction with one another on any of the motor graders sold pursuant to the Champion Dealer Agreements. For example, NPE's Attempt to Implicate Volvo Construction's Affiliate stated that Nueces "has

been a dealer of Champion/Volvo products since 1989." *See* Exhibit CC. Similarly, February 14, 2000 correspondence from one of the Other Potential Defendants stated that "J.D. Evans has been a dealer of Volvo/Champion products since 1971." *See* Exhibit EE. ***In fact, neither NPE nor J.D. Evans has ever been a dealer for Volvo Construction. Neither NPE nor J.D. Evans has ever been been licensed to distribute construction equipment under the VOLVO Marks. Nor have NPE and J.D. Evans ever sold construction equipment under the VOLVO Marks.*** In the South Texas Litigation, NPE also used "VCE [an acronym for Volvo Construction Equipment]/Champion" and "Volvo/Champion" throughout its Original Petition. *See, e.g.,* Exhibit Z ¶ 8 ("scheme of VCE/Champion"), ¶ 9 ("VCE/Champion's conduct"), ¶ 51 ("asking VCE/Champion for a meeting"), ¶ 56 ("Volvo/Champion products"), ¶ 58 ("between VCE/Champion and NPE"), ¶ 63 ("manufacturer/dealer relationship between VCE/Champion and NPE"), ¶ 64 ("contracts between VCE/Champion and NPE"), ¶ 65 ("VCE/Champion's action"), ¶ 66 ("conduct of VCE/Champion"), ¶ 66a. ("agreements with VCE/Champion"), ¶ 66b.("dealership relationship with VCE/Champion," "actions of … VCE/Champion"), ¶ 66c.("caused both by VCE/Champion"), ¶ 66d.("VCE/Champion," "VCE/Champion induced"), ¶ 67 ("conduct of VCE/Champion," "Court orders VCE/Champion," "VCE/Champion jointly and severally"), ¶ 70 ("VCE and/or Champion to 'terminate . . .'"), ¶ 71 ("VCE and/or Champion violated"), ¶ 71d.("NPE's dealer agreements with VCE/Champion"), ¶ 72 ("VCE/Champion's violations"), ¶ 74 ("VCE and/or Champion"), ¶ 76 ("VCE/Champion would furnish"), ¶ 77 (three references to "VCE/Champion"), ¶ 78 (two references to "VCE/Champion"), ¶ 79 ("action by VCE/Champion"), ¶ 80 ("action by VCE/Champion"), ¶ 81 ("VCE/Champion"), ¶ 83 ("VCE/Champion"), ¶ 85 ("VCE/Chalmpion"), ¶ 86 ("VCE/Champion"), ¶ 88 ("conduct of VCE/Champion"), ¶ 89 ("attempts by VCE/Champion"),

¶ 90 ("conduct by VCE/Champion"), ¶ 91 ("interference by VCE/Champion"), ¶ 96 ("VCE/Champion"), ¶ 102 ("conduct by VCE/Champion"), ¶ 103 ("misappropriation by VCE/Champion"), ¶ 104 ("conduct by VCE/Champion," "VCE/Champion"), ¶ 105 ("VCE/Champion"), ¶ 109 ("actions by VCE/Champion"), ¶ 113 (two references to "VCE/Champion"), ¶ 114 (two references to "VCE/Champion"), ¶ 116 ("VCE/Champion"), ¶ 119 ("VCE/Champion"), ¶ 120 ("VCE/Champion"), ¶ 121 ("VCE/Champion"), ¶ 122 ("VCE/Champion"), ¶ 124 (two references to "VCE/Champion"), ¶ 126 ("VCE/Champion"), ¶ 127 ("VCE/Champion"). In the South Texas Litigation, there is already some evidence that confusion among consumers is likely if it has not already occurred.

119.    Regardless of whether the CHAMPION Trademark Licensees have already caused any confusion with or tarnishment of the VOLVO Marks, any use by them of the VOLVO Marks without a license to do so would represent trademark infringement in violation of Section 32(1) of the Lanham Act, unfair competition in violation of Section 43(a) of the Lanham Act, and trademark dilution in violation of Section 43(c) of the Lanham Act.

**COUNT I**

**(FEDERAL LANHAM ACT TRADEMARK INFRINGEMENT,
UNFAIR COMPETITION, AND TRADEMARK DILUTION)**

120.    Volvo Trademark, Volvo Construction, and Champion Road hereby incorporate by reference the allegations of ¶¶ 1 through 119.

121.    The Lanham Act does not require the licensing of the VOLVO Marks to *any* third parties, including but not limited to the CHAMPION Trademark Licensees named as Defendants.

122.    Volvo Trademark, as the owner of the VOLVO Marks, and any "related company" within the meaning of Section 45 of the Lanham Act (including Volvo Construction) have the absolute right and indeed the affirmative duty, pursuant to Section 45 of the Lanham

Act, to control the quality and uniformity of the goods and services associated with the VOLVO Marks and the identity of independent dealers licensed to use the VOLVO Marks.

123. The fact that other goods and services *not* identified with the VOLVO Marks may be similar or even identical to goods and services that *are* identified with the VOLVO Marks does not mean that the VOLVO Marks can be used in connection with the sale and service of construction equipment that Volvo Trademark and/or Volvo Construction have *not* authorized to be identified with the VOLVO Marks.

124. The fact that motor graders currently sold under the CHAMPION Trademark may be — except for the identifying trademark — virtually indistinguishable from the motor graders that Volvo Construction intends to market under the VOLVO Marks beginning in January 2001 does *not* entitle the CHAMPION Trademark Licensees to a license to use the VOLVO Marks.

125. The fact that motor graders currently sold under the CHAMPION Trademarks may be — except for the identifying trademark — virtually indistinguishable from the motor graders that Volvo Construction intends to market under the VOLVO Marks beginning in January 2001 does *not* entitle the CHAMPION Trademark Licensees to distribution rights to motor graders identified with the VOLVO Marks.

126. Any use by the CHAMPION Trademark Licensees of the VOLVO Marks without a license to do so would represent trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

127. Any use by the CHAMPION Trademark Licensees of the VOLVO Marks without a license to do so would represent unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1).

128. Any use by the CHAMPION Trademark Licensees of the VOLVO Marks without a license to do so would represent trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)(1).

129. Neither Volvo Construction nor Champion Road has any obligation under the Lanham Act to license the VOLVO Marks to the CHAMPION Trademark Licensees. In addition, Champion Road — which is not a "related company," as that term is used in Section 45 of the Lanham Act, to Volvo Trademark with respect to the VOLVO Marks — has no right to license the VOLVO Marks to the CHAMPION Trademark Licensees.

## COUNT II

### (FEDERAL LANHAM ACT
### PREEMPTION OF INCONSISTENT STATE LAW)

130. Volvo Trademark, Volvo Construction, and Champion Road hereby incorporate by reference the allegations of ¶¶ 1 through 129.

131. Any state law requirement that Volvo Construction and/or Champion Road supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks would be preempted by the Supremacy Clause and the Lanham Act.

## COUNT III

### (NO BREACH OF CONTRACT)

132. Volvo Construction and Champion Road hereby incorporate by reference the allegations of ¶¶ 1 through 130.

133. Volvo Construction, as agent for Champion Road, has no contractual liability to the CHAMPION Trademark Licensees. Volvo Construction's principal, Champion Road, remains primarily liable under the Champion Dealer Agreements.

134. Neither Volvo Construction nor Champion Road has breached any provision of the champion Dealer Agreements.

135. The Champion Dealer Agreements' Claims Barring Provisions bar any claim by the CHAMPION Trademark Licensees for breach of contract.

136. The implied duty of good faith and fair dealing does not apply to Champion Dealer Agreements.

137. The implied duty of good faith and fair dealing, to the extent it applies, cannot be used to override express provisions of the Champion Dealer Agreements.

138. Neither Volvo Construction nor Champion Road has breached any implied duty of good faith and fair dealing applicable to the Champion Dealer Agreements.

139. The Champion Dealer Agreements' Claims Barring Provisions bar any claim by the CHAMPION Trademark Licensees for breach of the implied duty of good faith and fair dealing.

140. It would not breach the Champion Dealer Agreements for Volvo Construction and/or Champion Road to:

    a. terminate the Champion Dealer Agreements;

    b. terminate the CHAMPION Trademark Licensees' rights to distribute motor graders under the CHAMPION Trademark;

    c. discontinue the manufacture and sale of motor graders under the CHAMPION Trademark;

    d. rebrand motor graders formerly sold under the CHAMPION Trademark under the VOLVO Marks;

e.     refuse to license the VOLVO Marks to the CHAMPION Trademark Licensees; or

f.     refuse to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

141.   It would not breach any implied duty of good faith and fair dealing applicable to the Champion Dealer Agreements for Volvo Construction and/or Champion Road to:

a.     terminate the Champion Dealer Agreements;

b.     terminate the CHAMPION Trademark Licensees' rights to distribute motor graders under the CHAMPION Trademark;

c.     discontinue the manufacture and sale of motor graders under the CHAMPION Trademark;

d.     rebrand motor graders formerly sold under the CHAMPION Trademark under the VOLVO Marks;

e.     refuse to license the VOLVO Marks to the CHAMPION Trademark Licensees; or

f.     refuse to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

## COUNT IV

### (NO ANCILLARY TORTS)

142.   Volvo Construction and Champion Road hereby incorporate by reference the allegations of ¶¶ 1 through 141 by reference herein.

143. Neither Champion Road, as principal, nor Volvo Construction, as agent, owes any duty to the CHAMPION Trademark Licensees except as a result of the Champion Dealer Agreement.

144. The losses of which the CHAMPION Trademark Licensees complain or are likely to complain represent loss to expectancies under the Champion Dealer Agreements.

145. As the Fourth Circuit recently reminded litigants, the "distinction between contract and tort possesses more than mere theoretical significance." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), *rev'ing* 958 F. Supp. 1087 (W.D.N.C. 1997). By virtue of the economic loss rule and otherwise, the existence of the Champion Dealer Agreements bars any claim by the CHAMPION Trademark Licensees that it is somehow tortious for Volvo Construction and/or Champion Road to:

   a. terminate the Champion Dealer Agreements;

   b. terminate the CHAMPION Trademark Licensees' rights to distribute motor graders under the CHAMPION Trademark;

   c. discontinue the manufacture and sale of motor graders under the CHAMPION Trademark;

   d. rebrand motor graders formerly sold under the CHAMPION Trademark under the VOLVO Marks;

   e. refuse to license the VOLVO Marks to the CHAMPION Trademark Licensees; or

   f. refuse to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

146. The Claims Barring Provisions bar any claim by the CHAMPION Trademark Licensees that it is somehow tortious for Volvo Construction and/or Champion Road to:

a. terminate the Champion Dealer Agreements;

b. terminate the CHAMPION Trademark Licensees' rights to distribute motor graders under the CHAMPION Trademark;

c. discontinue the manufacture and sale of motor graders under the CHAMPION Trademark;

d. rebrand motor graders formerly sold under the CHAMPION Trademark under the VOLVO Marks;

e. refuse to license the VOLVO Marks to the CHAMPION Trademark Licensees; or

f. refuse to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

## COUNT V

### (NO STATUTORY VIOLATION)

147. Volvo Construction and Champion Road hereby incorporate by reference the allegations of ¶¶ 1 through 146.

148. By virtue of the Canadian Forum Selection Provision and the South Carolina Choice of Law Provision of the Champion Dealer Agreements, the statutes and common law doctrines of the states or provinces in which the CHAMPION Trademark Licensees are located and/or incorporated do not apply to the Champion Dealer Agreements.

149. It would not violate the statutes or common law doctrines of the states or provinces in which the CHAMPION Trademark Licensees are located and/or incorporated for Volvo Construction and/or Champion Road to:

a. terminate the Champion Dealer Agreements;

b. terminate the CHAMPION Trademark Licensees' rights to distribute motor graders under the CHAMPION Trademark;

c. discontinue the manufacture and sale of motor graders under the CHAMPION Trademark;

d. rebrand motor graders formerly sold under the CHAMPION Trademark under the VOLVO Marks;

e. refuse to license the VOLVO Marks to the CHAMPION Trademark Licensees; or

f. refuse to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks.

## PRAYER FOR RELIEF

WHEREFORE, Volvo Trademark, Volvo Construction, and Champion Road pray that the Court enter a declaratory judgment as follows:

1. As to Count I, that Volvo Trademark, Volvo Construction, and Champion Road have the right under the Lanham Act not to license the VOLVO Marks to the CHAMPION Trademark Licensees and not to supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks;

2. As to Count II, that the Lanham Act would preempt any requirement of state law that Volvo Construction and/or Champion Road license the VOLVO Marks to the CHAMPION

Trademark Licensees and/or supply the CHAMPION Trademark Licensees with motor graders under the VOLVO Marks;

3. As to Count III, that Volvo Construction and Champion Road have no liability to the CHAMPION Trademark Licensees for breach of contract or breach of the implied duty of good faith and fair dealing;

4. As to Count IV, that Volvo Construction and Champion Road have no liability in tort to the CHAMPION Trademark Licensees;

5. As to Count V, that Volvo Construction and Champion Road have no liability to the CHAMPION Trademark Licensees under the laws of the states or provinces in which the CHAMPION Trademark Licensees are located or incorporated; and

6. Granting Volvo Trademark, Volvo Construction, and Champion Road such further relief as is necessary and proper pursuant to 28 U.S.C. § 2202.

## DEMAND FOR JURY TRIAL

To the extent that their Complaint for Declaratory Judgment presents any *genuine* disputes as to issues of *material* fact, Plaintiffs Volvo Trademark, Volvo Construction, and Champion Road respectfully request trial by jury on all issues contained in this Complaint for which it is available.

This the 10th day of October, 2000.

Respectfully submitted,

VOLVO TRADEMARK HOLDING AKTIEBOLAGET,
VOLVO CONSTRUCTION EQUIPMENT NORTH
AMERICA, INC., and CHAMPION ROAD
MACHINERY LIMITED

By _____
         Counsel

Michael J. Lockerby
Stephen P. Demm
John Gary Maynard
  HUNTON & WILLIAMS
  Riverfront Plaza, East Tower
  951 East Byrd Street
  Richmond, Virginia 23219-4074
  (804) 788-8200

Carolyn A. Dubay (NC State Bar #26195)
  HUNTON & WILLIAMS
  One Hannover Square
  Suite 1400
  Raleigh, North Carolina 27601
  (919) 899-3000

T. Thomas Cottingham, III (NC State Bar #16439)
Albert Diaz (NC State Bar #21857)
Nash E. Long, III (NC State Bar #24385)
  HUNTON & WILLIAMS
  Bank of America Plaza, Suite 3500
  101 South Tryon Street
  Charlotte, North Carolina 28280
  (704) 378-4700

Counsel for Volvo Trademark Holding Aktiebolaget,
Volvo Construction Equipment North America, Inc.,
and Champion Road Machinery Limited

# NOTE:

# THIS IS A PARTIALLY SCANNED DOCUMENT.

# PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.